## McELHINNEY et al. v. SWEPSTON.
### (No. 2359.)

(Court of Civil Appeals of Texas. Amarillo. June 25, 1924.)

**I. Wills ⚖️163(1)—Burden on contestant to show undue influence.**

Burden is on contestants to show that execution of will was result of exercise of undue influence by beneficiary or others in his behalf.

**2. Wills ⚖️166(7) — Evidence necessary to prove undue influence stated.**

To prove undue influence, evidence of disposition to exercise it, susceptibility thereto, and result indicating exercise, as well as opportunity and motive, is necessary.

**3. Wills ⚖️163(6)—That will unjust or unnatural does not cast burden of disproving undue influence on proponent.**

That will seems unjust or unnatural or contains gross inequalities does not cast burden of disproving undue influence on proponent, though such facts may be considered in determining issue.

**4. Wills ⚖️316(3)—Evidence held insufficient to justify submission of issue of undue influence to jury.**

Evidence *held* insufficient to justify submission of issue of undue influence to jury.

**5. Appeal and error ⚖️1030 — Correct judgment not reversed for failure to follow formalities not injuriously affecting appellant's rights.**

Correct judgment should not be reversed for failure to follow formalities not injuriously affecting appellant's rights.

Appeal from District Court, Swisher County; R. C. Joiner, Judge.

Proceedings by J. E. Swepston, executor, to probate the will of Charles Donaldson, deceased, contested by W. J. McElhinney and others. From decree probating will, contestants appeal. Affirmed.

Oxford & Oxford and M. J. Baird, all of Plainview, for appellants.

D. H. Culton and Dennis Zimmermann, both of Tulia, for appellee.

BOYCE, J. This appeal is from the judgment of the district court of Swisher county, admitting to probate the will of Charles Donaldson, deceased. The will was offered for probate by J. E. Swepston, named therein as independent executor. This will, after providing for the payment of debts and erection of a monument over the grave of the deceased, devised and bequeathed all the remaining property to Wilhelm Dalluge. The contestants, who are the appellants here, are cousins of Charles Donaldson and claim to be his only heirs. They contested the will on the ground that its execution was the result of undue influence.

The trial court submitted the issue of undue influence to the jury, but thereafter "recalled the jury prior to the return of any verdict thereon and withdrew from their consideration said charge and special issues and proceeded to determine this cause upon the undisputed evidence." The court then proceeded to find that the will was duly executed while deceased was of sound mind, and that the evidence was insufficient to present an issue as to undue influence, and then decreed the probate of the will and the appointment of the independent executor named therein.

Only two questions are presented for decision: First, whether the evidence was sufficient to present an issue of undue influence. Second, if it should be found that it was not, then whether there was reversible error in the procedure followed by the trial court in the rendition of the judgment.

Briefly stated, the facts appearing from the evidence are as follows: Charles Donaldson, at the time of his death, was a bachelor about 65 or 70 years of age. When a lad, about 14 years of age, he came from Ireland

---

⚖️For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

to America, and he and his mother lived for some 3 or 4 years with Thomas Chambers, his mother's brother, as a member of said uncle's family. The funds necessary to make the trip from Ireland to America were furnished by Thomas Chambers. During the time of Charles Donaldson's residence in the Chambers home, he worked on the farm and went to school occasionally. After some 3 or 4 years, Charles Donaldson and his mother rented a farm near the Chambers farm in Iowa and thereafter maintained a home for themselves. In 1884, he and his mother moved to Nebraska, where his mother died some 20 years ago. For some 5 or 6 years before his death Charles Donaldson lived with Wilhelm Dalluge as a member of the Dalluge family. Dalluge was a tenant on Donaldson's farm in Nebraska, and for several years before they moved to Texas they lived together on such farm. The Dalluges and Donaldson moved to Swisher county several years before Donaldson's death. On coming to Swisher county, Donaldson bought a section and a quarter of land. He had the quarter section conveyed to Dalluge and his wife, jointly, and took title to the whole section in his own name. He continued to live with Dalluge on this farm in Swisher county until his death. Mrs. Dalluge testified as to this living together as follows:

"During these years Donaldson did just like he had done before in Nebraska, chored around and lived in the house. I done most of the buying of his clothing, but Donaldson paid for it. He did not do anything towards contributing to Dalluge's and my support, that is, furnishing the table or buying groceries, except the chores. There was never anything that I ever heard said about his charging us rent for his land. He was just like a member of the family there, and it all went in together. This grazing land was used by Wilhelm Dalluge in the same way. We had some cattle on it, and Donaldson had some cattle there too; I could not say exactly how many Donaldson had, around close to 50 head though, and they grazed there. This grazing land was the same as the other, part of the family arrangement. I don't know of any other moneys put into this family arrangement."

Thomas Chambers died in February, 1921, and his wife died in October, 1921. The contestants are the children and grandchildren of Thomas Chambers. On June 9, 1921, Charles Donaldson made a will, leaving his property to Mrs. Chambers. He had the county clerk of Swisher draw this will and left it with the clerk for safe-keeping. At the time of the execution of this will, he asked the clerk to say nothing about it. Later he told the clerk several times that circumstances had changed, and he had made another will, and asked the clerk to say nothing of this also. After the move to Swisher county, William Dalluge and his wife separated and were divorced. Donald-

son continued to live with Dalluge. Mrs. Dalluge testified that in July, 1921, after her separation from Dalluge, Donaldson and Dalluge came together in an automobile to the place where she was living; that Dalluge called to her and told her that Donaldson wanted to see her; that she went out to the car where Donaldson was, and Dalluge then asked Donaldson what he came up there for, to which Donaldson made no reply. Whereupon Dalluge spoke up and said: "We want those papers. We came after those papers." The witness then explained that Donaldson had intrusted to her care a tin box containing some private papers, including his will, which he had told her was made in her favor. She further testified that she got the papers and gave them to Donaldson. The witness continued:

"After that I met Charles Donaldson a number of times here in Tulia, but every time I would meet him or stop to talk to him there was always some of the Dalluge men folks come up. After that I never had a conversation with him for any length of time without some of them being present. One time after that when I saw him he made the remark that he was going to leave there as soon as he could get money enough to go. At that time we did not talk very long, only a few minutes, before some of the Dalluges came up. I had a short conversation at another time with Donaldson relative to his people, the Chambers family back in Iowa. He talked to me about them. From his conversation he appeared to be on friendly terms with them, and he requested me to let them know if anything should happen to him, but I didn't know where they lived."

The will admitted to probate was executed December 17, 1921. It was executed in the sheriff's office in Swisher county and was signed by the sheriff and a lawyer as witnesses. The sheriff testified that Donaldson, accompanied by Swepston, came to his office, and Donaldson asked him to sign the will as a witness. The other witness, a chance passer-by, was called by the sheriff and was asked to witness the execution of the will. Donaldson at this time said he had made "some other wills, but circumstances had changed some since he made the others." None of the Dalluges were present at this time. Donaldson died in February, 1923. At such time the will was in a sealed envelope in possession of the Tulia Bank & Trust Company, for safe-keeping; nothing appearing as to when and how it was deposited there, though it does appear that Donaldson had some war savings stamps also in the bank for safe-keeping. On the same day of Donaldson's death, but thereafter, a brother of Wilhelm Dalluge wanted to see the will, stating that they wanted to know whether he had made any request as to the place of his burial. An attorney was called and the will opened and read in the presence of several witnesses. Donaldson was fatally ill for several weeks before he died, but

Dalluge did not notify any of the contestants of that fact. No question is raised as to the sanity of the deceased at any time. The county clerk who drew and witnessed the first will testified that he talked to the deceased frequently; that—

"There was no indication in any of his conversations that he was being forced to make any kind of a will, and there was no intimation on his part that he was forced to make this will. There was no indication in his talk at the time I drew the will that he was laboring under fear of anybody. At that time there was nobody came with him; he came alone. It was after 6 o'clock in the evening. I saw Mr. Donaldson on the street after that a number of times prior to his death, and he still continued to appear of sound mind in my judgment. Mr. Donaldson, according to my judgment, had a remarkably good mind for a man of his age."

After Donaldson left Iowa, there was little association between him and the family of Thos. Chambers. A very desultory correspondence was kept up, and it is apparent from a letter written by him that the eldest of the contestants did not even know the post office address of Donaldson for perhaps several years after he left Nebraska. Just three days before the making of the will to Mrs. Chambers, Donaldson wrote a letter to Mary McElhinney, asking for the particulars as to the death of his uncle and inquiring as to the health of his aunt, saying that he would like to see them all. In this letter he stated that it had been a long time since he had heard from any of them. After the death of Mrs. Chambers, the contestants wrote Donaldson a number of letters, to which he did not reply.

[1, 2] The burden of proof was on the contestants to show that the execution of the will was the result of the exercise of undue influence by Dalluge or others in his behalf. We think they failed to discharge this burden. "The evidence, to prove undue influence, should show opportunity, disposition, motive, susceptibility to influence and a result indicating the exercise of undue influence." Schouler on Wills (6th Ed.) § 293. The evidence in this case shows opportunity and motive; but this is not enough. "The probate of a will cannot be set aside on proof of facts which at most do no more than show that opportunity to exercise undue influence may have existed, or to raise a bare suspicion that such influence may have been used." Brown v. Mitchell, 75 Tex. 9, 12 S. W. 607. Trezevant v. Rains (Tex. Sup.) 19 S. W. 567, 570; Simon v. Middleton, 51 Tex. Civ. App. 531, 112 S. W. 442 et seq.; Schouler on Wills (6th Ed.) § 303.

[3, 4] The appellant argues that the disposition of the property is unnatural and unreasonable; but this does not appear to be necessarily so. The contestants are only distant relatives. There had been little association between them and the deceased; the oldest of them was some 20 years younger than the deceased, who left Iowa for Nebraska when she was about 10 years of age, and thereafter there had been but little communication between them. For years the deceased had lived with Dalluge, evidently preferring that association to that of these distant relatives. So that it cannot be said that the will is an unnatural and unjust disposition of the property. But even if that is so, "the mere fact that the will seems unjust or unnatural, or contains gross inequalities, does not cast on the propounder the burden as to undue influence." Schouler on Wills (6th Ed.) § 304. Such a fact, if it existed, might be a circumstance to be considered in determining the issue. Simon v. Middleton, supra; Helsey v. Moss, 52 Tex. Civ. App. 57, 113 S. W. 599. Under the circumstances of this case, the fact that the deceased forgot his relatives is a very slight circumstance to be considered in determining the issue of undue influence. The only circumstance which tends at all to directly prove the existence of undue influence is the occurrence about which Mrs. Dalluge testified and the subsequent conversation between her and Donaldson, but these two transactions, in the light of the other evidence, prove little. Before the time that Donaldson and Dalluge were calling on Mrs. Dalluge for the will, which she supposed to be in her favor, Donaldson had written a will in his aunt's favor and deposited it with the clerk. It was not revoked until after his aunt's death several months later, and the will in favor of Dalluge was not written until some six months after the visit of Dalluge and Donaldson, as testified to by Mrs. Dalluge. These circumstances create merely the suspicion, which the cases say is insufficient. Surely, if Dalluge had acquired a dominating influence over the mind of the testator, some other circumstances tending to establish that fact could have been shown—something of the character of Dalluge and his association with the deceased, and something more of the physical and mental condition of the deceased at the time of the making of the will, so that there might be something more tangible on which to base a conclusion of coercion in this matter. Donaldson seems to have had business and property of his own and went about freely attending to it. The only evidence as to his mental condition is that he "had a remarkably good mind for a man of his age." It does not appear that he was at any time in ill health until a comparatively short time before his death. It does not appear that he was a man of weak character or will so that he might be easily dominated, nor does it appear that Dalluge was a man of such character as might obtain such dominance. We think, therefore, that the trial court was correct in his final conclusion that the evidence was insufficient

to justify the submission of the issue to the jury. In addition to the authorities already referred to, see Holmes v. Houston (Tex. Civ. App.) 241 S. W. 1039, and authorities cited in that elaborate opinion.

[5] We are inclined to think that under the circumstances the correct practice for the trial court to have followed would have been to withdraw the charge delivered and instruct the jury to return a verdict for the proponent. Citizens' National Bank v. Abeel (Tex. Civ. App.) 160 S. W. 609. But since the correct judgment has been rendered, it should not, we think, be reversed because of the failure to follow certain formalities, which in no wise injuriously affect the rights of the appellants. Fant v. Sullivan (Tex. Civ. App.) 152 S. W. 515, 522; American Surety Co. v. Hill County (Tex. Civ. App.) 254 S. W. 241, 247.

The judgment is therefore affirmed.