# WALTER J. MITCHELL et al., Executors,

## vs.

## MARY L. SLYE, Committee.

*Appeal—Delay in Transmitting Record—Negotiations for Settlement—Testamentary Capacity—Evidence—Instructions—Issues from Orphans' Court—Practice.*

That counsel for the parties, after the appeal was taken, reached and reduced to definite terms an agreement of settlement, the consideration for which was the dismissal of the appeal, excused the failure of the appellants' counsel to have the record transmitted to the Court of Appeals within the statutory time, this being done by them with the requisite diligence so soon as they were notified that the agreement would not be ratified by the appellee.                                   pp. 94-96

That appellants were told that the agreement of settlement would not be accepted as an excuse for delay in the transmission of the record cannot be considered, such a warning being inconsistent with the plain terms of the agreement.          p. 95

Evidence that testator, in his youth and early manhood, was selfish and had a violent temper, which manifested itself in various eccentricities of conduct; that he was irritable, easily excited and easily influenced, does not justify the inference that his testamentary capacity was affected by any congenital or permanent mental infirmity.                                   p. 98

Insanity cannot be proved by reputation or public opinion, nor can it be proved by hearsay or by what "the people all said."                                                     p. 99

There being no evidence that the testator ever suffered from inheritable insanity, evidence of the existence of insanity in his blood relations was inadmissible.                         p. 99

That a question asked a witness, though objectionable, was not objected to, is not a reason for refusing to strike out the answer thereto, if this latter, not being responsive to the question or such as could have been anticipated from the form of

the question, is objectionable upon grounds independent of those which could have been urged to the question.      pp. 99, 100

An objection to a question, even though not made until after the answer is given, is in time, if it appears that the delay was inadvertent and unintentional, and that there was exercised what under all the circumstances was reasonable diligence, or that no sufficient opportunity was given to make it sooner.      p. 100

That the court refused to allow a particular question to be asked is not a subject for review, if the same witness later gave the identical testimony sought to be elicited by the question.

p. 100

A witness having testified that in his opinion testator was incapable of making a will or contract, it was error to exclude a question asked him on cross-examination to test the value of his opinion, whether he was so positive in his belief "that if a man did a perfectly sane and safe thing he would still say that he could not make a valid contract."      pp. 100, 101

A witness having testified, as tending to show testator's want of mental capacity, that the will as executed differed from testator's intentions as expressed by him to the witness, caveatees were entitled to ask him on cross-examination wherein the will differed from testator's expressed intentions.      p. 101

On an issue as to testator's mental capacity, a question asked of a non-expert witness, "In what condition did you find him (testator) each time that you saw him?" was too general, as was a question, "Can you say what was his mental condition when you saw him?"      p. 101

Testator's family physician having testified that the effect of morphia on a person who had been operated on for the disease of which testator died, and was absorbing the toxin produced by the disease, depended on the idiosyncrasies of the patient, and that he did not feel competent to give an opinion as to what effect the absorption of the toxin would have, that "it would not necessarily affect him mentally, but might affect his capacity," it was proper to exclude a question asked of the witness, whether, assuming certain circumstances, he would state that the testator's mind had been so affected by morphia or toxin

as to make him incapable of making a valid will, the witness
having disqualified himself to answer the question.          p. 101

A physician who had known testator well for six or eight
years, saw him frequently at the hospital, knew of the opera-
tion there performed on him, and was with him when he first
went there, should have been permitted to testify as to testator's
mental capacity at the time of his going to the hospital, although
the will was not executed until some time after the operation,
the effect of his disease upon his mentality before the operation
being relevant to the question of its probable effect after the
operation.                                                  p. 102

A non-resident witness temporarily in the State, who would
be beyond the process of the court at any trial of the case at
which the testimony might be needed, is a witness who "cannot
be brought before the" courts within Code, Art. 35, Sec. 16,
authorizing the taking of testimony of such witnesses by com-
mission, and Section 17, which authorizes the taking before a
justice of the peace, notary public or commissioner, of the testi-
mony of witnesses of the classes named in the previous section.
                                                     pp. 102, 103

On an issue as to the testamentary capacity of testator, on
the trial of which the executors were defendants, it was error
to admit evidence as to the manner in which they had dis-
charged their duties as executors and trustees.             p. 104

It is error to admit, even by agreement, evidence involving a
foreign and collateral issue, which could only mislead and con-
fuse the jury.                                              p. 104

On an issue as to whether the contents of a writing purport-
ing to be decedent's will "were read to or by him and were
known to him," it was proper to instruct the jury that if deced-
ent was not "of sound and disposing mind and capable of mak-
ing a valid deed or contract," he was not capable of "knowing"
the contents of the will, knowledge in this connection meaning
an understanding of the contents.                      pp. 104, 105

On an issue as to testamentary capacity, it was proper to
instruct the jury that such capacity was lacking if testator was
not of "sound and disposing mind and capable of making a valid

·deed or contract," and that the meaning of this is that testator must at the time of making the will have "fully understood the nature of the business in which he was engaged, and must have had sufficient capacity at that time to know and recollect his property, and to make a disposition thereof with judgment and understanding, with reference to the amount and situation of the property, and to recollect the relative claims of the different persons who were or should have been the objects of his bounty, and also sufficient capacity to understand the manner in which he did in fact dispose of his property," and that it was "not necessary to find that testator was insane, in the popular sense of the word, in order to find him incapable of making a valid deed or contract, or a last will and testament."          p. 105

The clerk of the circuit court for a county has no power to enter up a judgment upon the verdict of the jury rendered on the trial of issues sent from the orphans' court, the proper practice being to certify the verdict and the costs to the latter court.
                                                        p. 106

*Decided November 17th, 1920.*

Appeal from the Circuit Court for Anne Arundel County (Moss, J.).

The questions asked of witnesses, which were involved in the sixth and eighth exceptions, were as follows: "In what condition did you find him each time that you saw him?" and "Can you say what was his mental condition when you saw him?"

Plaintiff's Third Prayer was as follows:

"The Court instructs the jury, that if they shall believe, from the evidence, that at the time of the execution of the paper writing in controversy in this case, and dated March 11th, 1911, the said Augustus B. Slye was not of sound and disposing mind and capable of making a valid deed or contract, then he was not in possession of that mental capacity, which is required by law, and their verdict should be in favor

of the plaintiff, on the fourth issue, and their answer thereto
should be 'No.' And the jury are further instructed that the
meaning of the words, 'sound and disposing mind and cap-
able of making a valid deed or contract,' in respect to the
disposition of property by last will and testament, is, that the
party making such will, must at the time of making the same
have fully understood the nature of the business in which he
was engaged, and must have had sufficient capacity, at that
time to know and recollect his property, and to make a dis-
position thereof, with judgment and understanding, with
reference to the amount and situation of his property, and to
recollect the relative claims of the different persons who were
or should have been the objects of his bounty, and also suffi-
cient capacity to understand the manner in which he in fact
did dispose of his property. And the jury are further in-
structed, that it is not necessary for them to find that Augus-
tus B. Slye was insane, in the popular sense of that word,
before they can find him incapable of making a valid deed
or contract, or a last will and testament."

Defendants' Third Prayer was as follows:
"The defendants pray the Court to instruct the jury that
if a man of sound mind, who can see and can read, signs his
name to a written paper, the law presumes that he knows the
contents thereof."

The cause was argued before Boyd, C. J., Briscoe,
Thomas, Pattison, Urner, Stockbridge, Adkins, and
Offutt, JJ.

*Albert S. J. Owens,* for the appellants.

*William L. Marbury* and *James Thomas,* for the appel-
lants and John H. Sothoron, remainderman.

*Edward L. Ward* and *Nicholas H. Green,* with whom was
*Albert M. Sproesser* on the brief, for the appellee.

OFFUTT, J., delivered the opinion of the court.

This is an appeal from certain rulings of the court made in the trial of a caveat filed by Mary L. Slye, sometime Committee of Susan N. Slye, a lunatic, to the will of Augustus B. Slye, which was probated in the Orphans' Court of Charles County, where the issues raised by the pleadings were framed, and sent to the Circuit Court for Charles County for trial, from which court they were removed to the Circuit Court for Anne Arundel County, where they were tried.

The appellee has moved to dismiss the appeal on the ground that the record was not transmitted to this Court within three months from the time the appeal was taken as required by the statute. The appellants admitted the delay, but contended that it was occasioned by the conduct of the appellee, and that they were not in default. This the appellee denied and in support of their respective contentions affidavits were filed in this Court by both parties.

From these affidavits and the record, it appears that the verdict of the jury on the issues was returned on November 13th, 1919, the order for appeal filed December 16th, 1919, the bill of exceptions on February 17th, 1920, and the record transmitted to this Court on April 6th, 1920. Some time after the filing of the bill of exceptions counsel for the respective parties began negotiations looking to a settlement of the controversy between them, as a result of which they reached an agreement purporting to be a complete and final adjustment of the disputation, which agreement was subsequently reduced to writing, and signed by counsel for both parties on March 23rd, 1920. This agreement was founded upon the expressed consideration that the appellants would "forthwith dismiss their appeal in this cause to the Court of Appeals of Maryland." While this written agreement was not signed until after the time fixed for the transmission of the record had elapsed, it is alleged on behalf of the appellants and not definitely denied, that it was but the formal

expression of the substance of the terms of an oral agreement reached before the expiration of that period.

Shortly after the written agreement was signed and before its terms had been carried into effect, Susan N. Slye, the lunatic, in whose behalf it purported to have been made, died, leaving to survive her, as her next of kin and heir at law, Mary L. Slye, her mother, who was then acting as her committee. Mrs. Slye, upon her daughter's death, immediately notified counsel for the appellants that she had not authorized any settlement of the caveat case and that no settlement of it would be acceptable to her, whereupon the appellants procured the prompt transmission of the record to this Court. It was further asserted that at the time the written agreement was signed by counsel it was understood by them that it was not to be considered binding until ratified by their respective clients.

It is clear that the delay in the transmission of the record in this case to this Court was due to the efforts thus made in good faith by counsel for the respective parties to settle the controversy between them without further litigation. Such efforts commend themselves to the favorable consideration of the courts and should be encouraged rather than penalized. Counsel for the parties in this case had reached and reduced to definite terms an agreement of settlement, the consideration for which was the dismissal of this appeal. Certainly, under such circumstances, it was not incumbent upon the appellants to incur further expense in the prosecution of an appeal which they had agreed to dismiss. The appellee asserted, it is true, that the appellants were told that the agreement would not be accepted as an excuse for any delay in the transmission of the record, but such a warning was so inconsistent with the plain terms of the written agreement that the two cannot stand together, and it will not be considered. Section 40, Article 5, Code Pub. Gen. Laws, provides that no appeal shall be dismissed because the record shall not have been transmitted within the time prescribed, where the delay

was occasioned by the neglect, delay or inability of the clerk
or appellee, and in *McGonigal v. Plummer,* 30 Md. 426, it
was held that, where the delay was "equally attributable to
the appellant and the appellee," the appeal would not be dis-
missed for that reason.   Since counsel for the appellee made
this agreement with counsel for the appellants, and since the
appellants, until they were notified that it would not be rati-
fied, could not have procured the transmission of the record
without violating its terms, and since they procured it to be
transmitted with the requisite diligence after they were so
notified, the motion to dismiss the appeal will be overruled.

This brings us to the consideration of the questions pre-
sented by the record.   There are twelve exceptions, eleven
of which relate to questions of evidence and one to the Court's
ruling on the prayers.   In the trial of this case there were
four issues of fact affecting the validity of the will of Augus-
tus B. Slye, the first of which related to the proper execution
of the will, the second, to the testator's knowledge of its con-
tents; the third, to whether its execution was procured by
undue influence, and the fourth, to the testator's mental
capacity at the time of its execution.

Augustus B. Slye died at the University Hospital in Bal-
timore March 27th, 1911, about one month after he had
undergone an operation there for tubercular peritonitis.   On
the 11th of March, while in the hospital, he executed the will
which is the subject of this controversy.   He had never mar-
ried, and at the time of his death his nearest relative was
Susan N. Slye, the daughter of his deceased brother William
H. Slye.   She at that time was about nineteen years of age,
and lived with her mother Mary L. Slye in Washington.   Her
father, from whom her mother had been divorced, was then
dead.   While Augustus B. Slye seldom saw his sister-in-law
after she left his brother's home in 1903, he often saw her
daughter, his niece, to whom he was greatly attached.   She
frequently, at his invitation, visited him at his home in
Charles County, and when he came to Washington he often

invited her to see him at the hotels at which he happened at the time to be staying.

He lived on his farm near Benedict in Charles County. It is inferred from the record that he did not himself operate this farm, but that it was carried on by tenants, and that his principal income consisted of the rents and profits from it. He appears to have lived a somewhat aimless life; he had no regular occupation, was interested in horses and to some extent horse racing, and on one occasion represented his county as a delegate to the General Assembly of Maryland. The testimony of several of the witnesses conveys the impression that he was a somewhat idle man, of limited education, of some intelligence, fond of pleasure and sports and a genial companion, but not a particularly good manager.

For some time before he went to the hospital his health had been failing. He suffered from gastritis, and was at times unable to eat or to assimilate food when he could eat. He was gradually growing weaker and finally, upon the advice of physicians, determined to undergo an operation. Some days after the operation he sent for Walter J. Mitchell, one of the appellants, and who was then and had for a long time been his counsel, and told him that he wanted his will drawn and informed him of the manner in which he wanted to dispose of his property. Throughout this interview, and indeed in a number of conversations had with different persons prior to it, he expressed his desire and intention of giving his property to his niece, Susan N. Slye, but it was also testified that on several occasions he expressed his determination to dispose of his property in such a manner that his sister-in-law, the mother of Susan N. Slye, would not be able in any event to take it. The will was drawn and presented to the testator by Mr. Mitchell several days later and, after a modification indicated by Slye had been interlined in it at his suggestion, he executed it on the 11th day of March, 1911.

Under this will his estate, consisting principally of the farm on which he lived, was left in trust for his niece dur-

ing the life of her mother, and if she or any child or children
of hers survived her mother, it was to go then to her, or in
the event of her death, to her child or children if she left any
to survive her, but if she predeceased her mother without
leaving any child or children to survive her, then it was to
go to John H. Sothoron or his representatives.

Upon his death this will was admitted to probate, and
shortly afterwards, in 1911, a caveat was filed to it by Susan
N. Slye. Nothing further was done until 1917, when issues
were framed and transmitted to a court of law for trial. In
the meantime Susan N. Slye, following a severe illness, had
become and was adjudicated mentally unsound, and her
mother appointed her committee, and in November, 1919, the
issues were tried.

At the trial of these issues the testimony offered was di-
rected mainly to the mental capacity of the testator at the
time of the execution of the will, and the admission or rejec-
tion of such testimony is the subject of the first nine excep-
tions, which will now be considered.

The mental capacity of the testator at the time the will
was executed was assailed upon two grounds, one, that of a
mental infirmity which, if not congenital, was at least of long
standing and permanent in its character, and the other, that
of a casual and adventitious mental weakness caused by the
absorption of the toxin produced by the disease from which
he suffered, and by the drugs administered to him in the
course of its treatment. In support of the first theory evi-
dence was offered to show that, in his youth and early man-
hood, the testator was selfish and had a violent temper, which
manifested itself in various eccentricities of conduct, that he
was irritable, easily excited, and easily influenced, but there
was no testimony sufficient to warrant the inference that his
testamentary capacity had at any time been affected by any
congenital or permanent mental infirmity. In this state of
the proof the appellee, testifying in her own behalf, was asked
whether Henry Sothoron, the maternal uncle of the testator,

was "sane or insane," and before any objection was made to the question she replied "I have no technical knowledge, but the people all said he was insane." The appellants then moved to strike out this answer, but the court overruled the motion and its action is the subject of the fifth exception. There was injurious error in this ruling. The answer should have been stricken out for two reasons: first, because at most it was but public opinion or hearsay; and second, because there was no evidence in the case sufficient to warrant the inference that the testator had ever suffered from any form of inheritable insanity. "Insanity cannot be proved by reputation or public opinion, nor can it be proved by hearsay or by what somebody else said." *Wharton & Stille's Med. Jur.* (5th Ed.), par. 331; *Waters* v. *Waters,* 35 Md. 531, 542. And since the testimony was entirely hearsay and therefore inadmissible, it should for that reason have been stricken out. It was also inadmissible because there was no evidence that the testator ever suffered from inheritable insanity and, in the absence of such proof, evidence of the existence of insanity in his blood relations was inadmissible. This Court, in *Berry* v. *Safe Deposit & Trust Company,* 96 Md. 63, said: "It is competent to prove that insanity exists or existed in the family of the person whose sanity is under investigation, but this can only be done after a foundation has been laid by an offer of some direct proof of the insanity of the person whose mental condition is in issue. It is only cumulative evidence and unless the foundation above indicated has been laid, it is not admissible." 1 *Wharton & Stille's Med. Jur.* (5th Ed.), par 330; *Commonwealth* v. *Dale,* 264 Pa. 362. It is said, however, that the objection coming after the question had been answered was too late and should not be considered. This criticism is without substantial merit. The answer was not responsive and could not have been anticipated from the form of the question. It is true that the question itself was, for reasons already stated, objectionable but, by failing to object to it, the appellants were not thereby pre-

cluded from objecting to the answer, when it was objection-
able upon grounds independent of those which could properly
have been urged to the question. The appellants could not
have known before the answer was given that it would not
only be intrinsically improper, but would introduce testimony
which did not respond to the question and was not contem-
plated by it, and as soon as it was given the objection was
made. But even aside from this we think the objection was
in time. The rule requiring objections to testimony to be
made promptly is for the purpose of facilitating rather than
retarding the administration of justice, and should receive
a reasonable interpretation, and even when the objection
comes after a question has been answered, if it appears that
the delay was inadvertent and unintentional, and what, under
all the circumstances was reasonable diligence, was exercised,
or that no sufficient opportunity had been given to make it
sooner, the objection will be considered to have been taken in
time.

The remaining exceptions, relating to testamentary capac-
ity, may be disposed of more briefly. Harriet J. Parsons, a
subscribing witness to the will, was examined, cross-examined,
re-examined and discharged by the appellants, the other sub-
scribing witness examined, and the will offered in evidence.
Miss Parsons was then recalled and asked whether, at the
time the will was executed, the testator was of sound and dis-
posing mind and capable of executing a valid contract. The
court refused to allow this question to be asked, and its action
is the subject of the first exception. Since the same witness
later in the case gave the identical testimony sought to be
elicited by this question, the appellants were not injured by
this ruling, and its further consideration is unnecessary.

George Slye, a cousin of the testator, was permitted to tes-
tify that in his opinion the testator was not capable of mak-
ing a "will or contract." Upon his cross-examination the
witness was asked whether he was so positive in his view
"that if a man did a perfectly sane and safe thing he would

still say he could not make a valid contract." This question
the court refused to allow. The witness also testified that the
will differed from the intentions of the testator as he had
expressed them to the witness, and he was then asked wherein
the testator had departed from his expressed intentions, which
question the court refused to allow. These rulings are the
subject of the third and fourth exceptions. It is not clear
upon what ground these questions were objectionable. They
were asked for the purpose of testing the value of the wit-
ness' opinion. In *Waters* v. *Waters,* 35 Md. 538, a witness,
having testified to the testamentary capacity of the testator
whose will was in issue, was shown the will and asked to say
whether he thought the distribution of property by the will
was "intelligent and proper," and this Court, in passing on
the propriety of the quetion, said: "Such a question was
pertinent both for the purpose of ascertaining the meaning
of the witness' testimony in chief, and for testing his capacity
to form a correct judgment with regard to what would be an
intelligent and proper disposition by the testator of his prop-
erty." We are of the opinion that the questions were proper
and should have been allowed.

The sixth and eighth exceptions relate to the exclusion of
the opinions of non-expert witnesses as to the testator's testa-
mentary capacity. The questions involved in these exceptions
were too general, and there was no error in their rejection.

The seventh exception relates to the court's refusal to al-
low a hypothetical question to be asked in the redirect exam-
ination of Dr. Louis Carrico. The witness had testified that
he was the family physician of the testator, had known him
for a number of years, and had seen him shortly before he
went to the hospital, and that up to that time he was capable
of executing a valid will or contract. On cross-examination
he testified that the effect of morphia upon the mental capac-
ity of a person who had been operated on for tuberculosis of
the intestines and was absorbing the toxin produced by the
disease depended upon the idiosyncracies of the patient. He

further said that he did not feel competent to give an opinion as to what effect the absorption of the toxin would have, that "it would not necessarily affect him mentally but might affect his capacity." The witness having been told to assume certain facts relative to the conduct and statements of the testator at the time the will was executed, was asked, whether under such circumstances he would state that the testator's mind had been affected "by morphia or toxin to make him incapable of making a valid will." The witness had expressly disqualified himself from answering this question, and there was no error in the court's refusal to permit him to answer it. *Maryland & P. R. R. Co.* v. *Tucker,* 115 Md. 43; *Grill v. O'Dell,* 113 Md. 637.

William C. Queen, a physician practicing in Baltimore, testified that he had known Mr. Slye very well for six or eight years; that he saw him nearly every day he was at the hospital, knew of the operation on him, and that he was with him when he first went to the hospital. He was then asked whether at that time the testator was capable of making a valid deed or contract. The court refused to permit this question to be asked and its ruling is the subject of the ninth exception. There was testimony in the case that the absorption of the toxin produced by the testator's tubercular condition affected him mentally. He was suffering from that condition when he went to the hospital, and it may be inferred that he absorbed a greater quantity of the poison before than after the operation. Its effect upon his mind before the operation was therefore relevant and material to be considered in determining its probable effect upon him after the operation. The witness was competent and had had sufficient opportunity to form an opinion, and he should have been permitted to answer the question.

The second exception relates to the admission in evidence of the deposition of Nally R. Ringgold. The witness was a non-resident of Maryland, temporarily in the State on a visit to her parents, and intended returning to her home in Chicago

before the fall of 1918.   Her testimony was taken before a
notary public in Baltimore, after the requisite notice had
been given, and counsel for the appellants were present at
the hearing and cross-examined the witness.   It is contended
that this deposition should not have been admitted because it
was taken before a notary public instead of a commissioner
appointed by the court for the purpose, but we cannot assent
to this view.   Section 16, Article 35, Code Pub. Gen. Laws,
authorizes the "several courts of law and any of the judges
thereof" upon the application of any party interested in any
suit, action or proceeding depending therein, upon being sat-
isfied that there are material and competent witnesses therein
"residing or living out of this State, or who for any reason
cannot be brought before them," to direct the respective clerks
of such courts to issue a commission for taking the deposition
of such witnesses.   Section 17, *Ibid,* provides that in addi-
tion to the mode provided in Section 16 the testimony of
"non-resident witnesses" may be taken before a justice of the
peace, notary public or commissioner, upon complying with
the conditions prescribed by that section.   Section 17 does
not in any way affect the classification of witnesses whose
testimony may be taken under the authority of Section 16,
but merely affords another method of taking it.   The author-
ity for taking the testimony of the witness must therefore be
found in Section 16.   It is apparent that the scope of its pro-
visions is not limited to non-resident witnesses who may be
without the state, because after providing for taking the tes-
timony of such witnesses, it also provides for taking the tes-
timony of witnesses "who for any reason cannot be brought
before" the courts.   It would seem that a non-resident wit-
ness temporarily in the state, and who would be beyond the
process of the court at any trial of the case in which the
testimony might be needed, is a witness who "cannot be
brought before" the courts, and that this section embraces
such cases.   And as the witness whose testimony was taken

under this deposition was such a witness, it follows that her deposition was properly admitted.

The tenth and eleventh exceptions bring up for review the action of the lower Court in permitting the examination of the appellants as to their administration of the trust estate of Augustus B. Slye. There was manifest error in these rulings, and although it is noted on the record by the learned judge who presided at the trial, that the testimony involved in them was admitted by agreement, they are nevertheless the subject of these two bills of exception. This testimony had no apparent relation to any issue in the case, and its only possible effect was to introduce an entirely foreign and collateral issue in the case, which could only mislead and confuse the jury. The manner in which the appellants had discharged their duties as trustees under the will had no conceivable relation to the testamentary capacity of Augustus B. Slye at the time the will was executed.

The remaining exception involves the court's action in regard to the prayers. The appellee offered five prayers, which were granted, and the appellants offered nine prayers, of which the third was rejected and the others either granted or conceded. The only rulings to which serious objection is made are the granting of the plaintiff's second and third prayers and the refusal of the defendants' third prayer. In the second prayer of the appellee the jury are instructed that if, at the time of the execution of the will the testator was not "of sound and disposing mind and capable of making a valid deed or contract," that he was not capable of "knowing" the contents of the will, and that their answer on the second issue should be "No." This prayer assumes that a person who is incapable of making a valid deed or contract is for that reason incapable of having "knowledge" of the contents of such an instrument as a will, even though he has read it or heard it read. It makes the "knowledge" referred to in the issue depend upon testamentary capacity. In its form this issue differs from that usually submitted in that it not

only required that the contents of the will should have been read to or by the testator, but that they should have been known to him. The form of this issue was disapproved by this Court in *Hall* v. *Yellott,* 130 Md. 248, where it was said that the form invariably used in this State in presenting this question was that approved in *Munnikhuysen* v. *Magraw,* 35 Md. 289, namely, whether the will was read to or by the testator "or" known to him at or before its execution. While this question is not before us, it is referred to to indicate why the numerous cases decided by this Court in connection with questions incidental to this issue do not control the question now being considered. For while in *Harris* v. *Hipsley,* 122 Md. 418, it was held that although there was evidence legally sufficient to go to the jury on the question as to whether the testator had the mental capacity requisite to make a will, yet where the proof showed the will had been read to or by the testatrix, the jury should have been peremptorily instructed to find their verdict for the caveatees on that issue, it will be found that the issue in that case was whether the contents of the will were read to or by the deceased *"or"* known to her, while the issue here is whether they were read to or by the deceased *"and"* known to him. Since there cannot be knowledge without understanding and as there cannot be understanding without the mental capacity sufficient to make a valid deed or contract, the proposition contained in the second prayer is a correct statement of the law. "Knowledge" used in this sense must mean more than a mere sensory consciousness of the physical existence of the will, it must mean an understanding of its actual contents, and, if there is no mind to understand, manifestly there can be no understanding. This position was recognized by the lower Court in *Lyon* v. *Townsend,* 124 Md. 167, in granting the plaintiff's fourth prayer.

The plaintiff's third prayer correctly states the law relating to the issue of testamentary capacity and was approved in *Lyon* v. *Townsend, supra,* in *Kamps* v. *Alexander,* 133

Md. 198, and in *Smith* v. *Shuppner,* 125 Md. 409, and was properly granted. Nor was there reversible error in rejecting the defendants' third prayer, for while the prayer states the general rule applicable to the facts in issue (*Taylor* v. *Cresswell,* 45 Md. 422), it is stated so generally as to be a mere abstraction and was for that reason properly refused.

Although not referred to in the briefs or in the oral arguments, there is an error apparent on the record to which reference should be made in order that in any future trial of this case it may be corrected. The clerk of the Circuit Court for Anne Arundel County entered up a judgment upon the verdict of the jury in this case. In making such entry he acted without any legal power or authority and the judgment was a mere nullity. The uniform practice in such cases is for the verdict of the jury and the costs in the court in which the case is tried to be certified to the Orphans' Court from which the issues were sent (*Browne* v. *Browne,* 22 Md. 103; *Hipsley* v. *Harris,* 122 Md. 427), and not to enter any judgment on the verdict in the court where the case is tried.

Because of the errors indicated it will be necessary to reverse the rulings and remand the case.

*Rulings reversed and cause remanded.*