FRIEDEL and EISNER, EXECUTORS OF THE
ESTATE OF LILLIE E. NORTH v.
BLECHMAN, et al.

[No. 233, September Term, 1967.]

*Decided June 3, 1968.*

The cause was argued before HAMMOND, C. J., and MAR-
BURY, BARNES, FINAN and SINGLEY, JJ.

*Ellis Peregoff* for appellants.

*Irvin N. Caplan,* with whom were *Howard Calvert Bregel,
Calvert Ross Bregel* and *Wallace Dann* on the brief, for ap-
pellees.

SINGLEY, J., delivered the opinion of the Court.

Lillie E. North, a 72 year old widow who had neither chil-
dren nor descendants died at Sinai Hospital on 7 December
1965. Her next of kin at the time of her death were her brother,
Irvin Eisner; a niece, Marcia Eisner, the only child of a de-
ceased brother, Daniel Eisner, who died in 1963; and three
nieces, Geraldine Blechman, Marcia Dahne, and Charlotte Kun-
koski, and a nephew, William Eisner, all children of a deceased
brother, Louis Eisner, who died in 1958.

On 1 November 1965, while a patient at the hospital, Mrs.
North executed a will which disposed of an estate later in-
ventoried at some $22,000. The will left legacies of $1,000 to a
friend, Rose Sachs; of $2,000 to her niece, Marcia Eisner; of
$500 each to the Associated Jewish Charities, the Talmudical
Academy, the Ner Israel Rabbinical College, and the State of
Israel; and of $3,000 to Gilbert I. Friedel, whom Mrs. North
described as her "attorney and friend." The residue of the estate
was devised and bequeathed to Mrs. North's only surviving
brother, Irvin Eisner. Mr. Eisner and Mr. Friedel were named
as executors. After Mrs. North's death, the will was admitted
to probate and the executors duly qualified.

Thereafter, the four children of Louis Eisner (the caveators) who are the appellees here, filed a petition and caveat in the Orphans' Court of Baltimore City against Mr. Eisner and Mr. Friedel, as executors (the caveatees). The usual issues, seven in number, were framed and sent to the Court of Common Pleas for a trial by jury. Maryland Code (1957, 1964 Replacement Volume) Art. 93, §§ 278 and 280; Sykes, *Contest of Wills in Maryland* (1941), § 21 at p. 29; *Myers v. Hart,* 248 Md. 443, 237 A. 2d 41 (1968); *Fidelity Trust Company v. Barrett,* 186 Md. 483, 47 A. 2d 72 (1946). Later, 18 additional issues, framed by counsel, were transmitted by agreement by the Orphans' Court to the law court, so that when the trial commenced below, there were 25 issues to be submitted to the jury.

The trial of the case took the better part of four days. From the testimony, a reasonably accurate picture of Mrs. North can be developed. For more than 40 years, she had lived at 2316 West Baltimore Street in a house which was owned by a sister, Bessie Eisner, and after the death of Mr. North in 1958 and the hospitalization of her sister in about 1963, had lived there alone. The house was cluttered and untidy and Mrs. North was at times careless about her appearance. In years past, the relationship between Mr. and Mrs. North and Louis Eisner's children had been a close one; but after Mr. North's death and the marriage of the nephew and nieces, she saw them infrequently, principally at family gatherings. Although Jewish, and apparently the daughter of orthodox parents, she had wandered away from Judaism and had become interested in Christian Science, and visited the reading room and attended lectures at the Third Church with some regularity.

In September of 1964, Mrs. North had gone with her brother, Irvin Eisner, to the office of Mr. Gilbert I. Friedel (who was Mr. Eisner's lawyer) to consult him about the administration of the estate of her sister Bessie, who had died in August at Spring Grove State Hospital. Although Mrs. North renounced her right to administer on the estate, and presumably had limited contacts with Mr. Friedel,[1] it would seem that some bond

---

1. Most of her business was conducted with Mr. Jerome Katz, Mr. Friedel's associate, and related to the termination of Mrs. North's committeeship for Bessie.

developed between them, because she called his office each Friday to wish him a "happy Sabbath."

On 27 October 1965, Mrs. North called Mr. Friedel at about 10:30 a.m. and said that she wanted to see him "right away" because "she was going to Sinai Hospital." Mr. Friedel went to 2613 West Baltimore Street, where Mrs. North gave him five bankbooks, some jewelry wrapped in handkerchiefs, and $1,746 in cash. Mr. Friedel insisted on giving Mrs. North a receipt for the money, but "she tore it up and she said she wanted [him] to have it." When Mrs. North suggested that the bank deposits be withdrawn for hospital expenses, Mr. Friedel said that it would be preferable for him to have a power of attorney, and Mrs. North agreed.[2]

In the late afternoon of 27 October, Mr. Friedel stopped at the hospital to see Mrs. North on his way home to dinner. Mr. Friedel described the conversation:

> "And, anyway, after then she discussed with me about a will. She said she didn't have a will. Her sister had a will. And, she told me she wanted to leave me all the money. And, I told her, I'm not interested in her money, I just represented her and I am a friend of hers, and I didn't want her money."

It was then agreed that Mr. Friedel would bring an associate, Mr. Jerome M. Katz, with whom Mrs. North was acquainted, to the hospital to draw the will.

Mr. Katz testified that he had first met Mrs. North in September, 1964; that he went with Mr. Friedel to the hospital at about 5:30 p.m. on 1 November 1965; that Mrs. North was sitting up in bed; and that after an exchange of pleasantries, a conversation ensued:

> "Then I said that 'I understand you want me to prepare the will for you.' And she said, 'Yes.' And * * * she then said, 'Well, I would like to leave Mr. Friedel everything.' And he said, 'Well, I don't want you to

2. The testimony indicates that Mr. Friedel never acted under the power of attorney, since the $1,746 was more than was needed to pay Mrs. North's hospital, medical and funeral expenses.

leave me anything.' So, at that time, I then put my briefcase down and I began to prepare the will."

Mr. Katz testified that he wrote the introductory paragraph and a provision with respect to the payment of debts and funeral expenses, and then,

"I asked her where she desired to be buried, and she said that she wanted to be buried on the family lot. So—and, I put, 'I desire to be buried in my family lot.' And, I asked her who did she want to leave her estate or money to, and she said, 'Well, I first want to give my friend Rose Sachs a thousand dollars', so I put that down. Then I said, 'What else,' and she said, 'I want to leave my niece Marcia Eisner, who is the daughter of my dead brother Daniel, $2000.' And, I then proceeded to write that down. Then she said, 'Now, I want to give the Associated Jewish Charities $500.' And, I put that down on the paper. Then she said, 'I want to give Ner Israel Rabbinical College $500, and the State of Israel $500,' which I also put down, and she mentioned she wanted to give the Talmudical Academy $500, which I put down, but then she said, 'I do want to give Mr. Friedel something because he has been such a good friend and attorney to me, and I want to give him $3000,' and I put that down. And I said, 'Well, who do you want to give the rest of your estate to?' She said, 'Well, I'll give the rest of my estate to my, I want to give the rest of the estate to my brother Irvin Eisner, and put down the part about (reading) 'All the rest, residue and remainder of my estate, whether real, personal, or mixed, where so ever located, I do hereby give, devise and bequeath unto my brother, Irvin Eisner.' And then I asked her who did she want to appoint as executors of her will, and she said that she wanted Irvin Eisner, her brother, and Mr. Friedel to be her executors, and I put that down on the will."

Mr. Katz continued:

"(Witness) Upon completion of the will, I read the

will to her, the entire will from beginning to end and then I handed the will to her for her to read.

(The Court) What did she do with it, if anything?

(Witness) She took the will and proceeded to read it.

(The Court) All right. What happened after that?

(Witnes) Then I went out of the room to get a nurse to get a doctor to be another witness besides myself, and then I came back into the room.

(The Court) Who witnessed the will?

(Witness) Then Dr. Roth came into the room and, and he and I witnessed the will.

(The Court) Who got Dr. Roth?

(Witness) The nurse got Dr. Roth.

(The Court) At whose request?

(Witness) At my request.

(The Court) How was the will executed?

(Witness) In the presence of Dr. Roth and myself, Mrs. North signed the first page of the will and then signed the second page of the will on a line I had drawn for signature. Dr. Roth and I then witnessed her signature.

(The Court) In your opinion did the deceased understand the nature and consequence of her acts?

(Witness) Yes.

(The Court) Was it a voluntary act * * *, on her part, in your opinion?

(Witness) Yes, sir."

Dr. Marvin Alan Roth, who was a member of the house staff at the hospital when Mrs. North was admitted, and the other witness to the will, testified that Mrs. North had signed the will in his presence and in the presence of Mr. Katz, and that they had both witnessed the will in her presence. In response to questions, he said that he had seen Mrs. North at least once each day from 27 October to 5 November; that "her general condition was good"; that "[s]he was well oriented in time and place on the dates that I saw her" and that "When I took care of [Mrs. North] she was not pretty sick."

Mrs. Rose Sachs, a friend of Mrs. North's visited her on 28 October, the day after the hospital admission, and regularly thereafter. She testified about a conversation with Mrs. North about the will but was unable to fix the exact date:

"When she said to me that she made a will and I looked at her, I was really astonished. She said, 'Yes, I'm going to tell you all about it, and you are in the will.' This is what I did answer her. I said, 'You must be crazy.' I said, 'I didn't want to ask her where she got her money, it was none of my business.' So, kiddingly, I said to her, 'You've always spoken of wanting to go to Florida. If you want to do something, you can take me—get well and get out of here and you can take me to Florida.' She said, 'We will see about that later.' I said, 'All I want you to do is get well, if you have anything, enjoy it and live to 140.' She said, 'Now, I'm going to tell you something else. Mr. Friedel has been a very, very close friend to me, he has been kind, he has been helpful, he used to talk to me very nicely.' She said, 'Every Friday I used to call him, which I told you, to wish him Good Shabbos.' That means, I don't know if I can translate it or not, sort of good wishes on our Sabbath. She says, 'You know how much I always thought of Mr. Friedel.' So, I did say this, I says, 'Lil, you got a brother, what about your brother Irvin?' She says, 'My brother Irvin is going to be well taken care of.' I said, 'I want to tell you something, we may have fought, we may have had our arguments and everything else, I loved him, I still love him and I'll never forget it.' So, I did make this statement, I says, 'But, Lil, I am only a stranger to you. Even though we have been closely associated and friends, you have nieces and nephews.' She says, 'I am not leaving them one red penny. They have not bothered about me. I was sick, I called up my nephew Billy [Mr. William Eisner] to come over—I think this might have been a week or ten days before she entered the hospital—and he did not * * * come over. But when I called my nephew, Alan [Mr. Irvin Eisner's son], up, he did come over.' * * * She said, 'As far

as my nieces and nephew'—may I use the word? * * *
She said, 'They stink.' She said, 'They have never
bothered about me. When I went to any affairs of
theirs, they dropped me off at their convenience,' she
said, 'which you well know.' "

Mrs. North underwent surgery on 5 November for the re-
moval of a large abdominal mass; was transferred from the
hospital to a nursing home on 19 November, commenced to
hemorrhage; and was returned to the hospital on the same day
and stayed there until she died on 7 December.

The testimony offered in behalf of the caveators was largely
cumulative in effect. Mrs. Blechman testified that in the "past
several years [she had visited Mrs. North] not too often;" that
she had last seen Mrs. North at a nephew's Bar Mitzvah in
September, 1965; that she did not know that Mrs. North was
in the hospital until 5 November, the day of her operation; that
she went to the hospital on 6 November with her sister, Mrs.
Marcia Dahne; that she visited Mrs. North a "couple times"
between 7 November and 19 November, but after 19 November
"every day except Saturday;" and that on a visit subsequent to
6 November, Mrs. North asked her "to find out what kind of
paper she had signed" and "to please find her rings."

On Thursday, 2 December 1965, Mrs. Blechman and Mrs.
Dahne visited Mrs. North at the hospital. As Mrs. Blechman
tells of the visit:

"She seemed particularly distressed and upset and
started pleading with us to get Mr. Caplan or some-
body to come talk to her and do something for her and
please get her rings and her, find out what she had
signed, so I went to the phone and I called Mr. Cap-
lan and he dictated a paper, something to me over the
phone * * * and he said to have her sign this."

The paper, offered in evidence, was a direction addressed to
Gilbert Friedel and Jerome Katz, authorizing them "to turn over
to my niece, Jerry Blechman, the following: my marriage ring
[my] engagement [ring] and all papers which I signed
for you after I entered Sinai Hospital." Mrs. North added some
language which is indecipherable, but was apparently too weak
to sign the paper. Mrs. North died five days later.

The testimony of Mrs. Marcia Dahne, Mrs. Blechman's sister, was essentially similar. She apparently had been close to Mrs. North at one time, but in the two or three years prior to Mrs. North's death, had "seen her at several family functions and then the two religious holidays." She saw her aunt at Rosh Hoshanah in 1965. Mrs. Dahne confirmed the conversation about the "paper" Mrs. North had signed, but definitely fixed the date of the first conversation as after 19 November.

Mr. William Eisner, Mrs. North's nephew, testified, as did his sisters, that he had been closer to his aunt in the past than in recent years; that he had seen her at family affairs and had visited her at the hospital after her operation; and that as a result of her concern over her affairs, and after a conference with his sisters, he had asked his own attorney, Mr. Reuben Caplan, to see Mrs. North.

Mr. Reuben Caplan, a member of the Baltimore bar, called as a witness for the caveators, testified that he had visited Mrs. North at the hospital on 29 November 1965 at the request of William Eisner. He described the conversation:

"I asked her what she wanted to talk with me about. She told me that she wanted me to find out something for her. I asked her what it was. She said that they had gotten her to sign a paper. She didn't know what the paper was about and wasn't explained to her; they just got her to sign it. I said, 'Who got you to sign it?' She said, 'Mr. Katz.' I said, 'Well, wasn't Mr. Katz your lawyer?' She said, 'No.' I said, 'Well, who was your lawyer?' She said, 'Mr. Friedel is my lawyer.' I said, 'Did they explain to you what the paper was?' She said, 'No.' I said, 'Didn't they tell you what was in the paper before you signed it?' She said, 'No.' I said, 'All right, I'll find out for you what the paper was about and I'll call Mr. Katz and if I find out anything at all either I'll come back or I'll send word back to you through Mr. Eisner.' I then asked her if there was anything else she wanted me to do besides finding that out, and she said, no, that was all she wanted me to do at the present."

Mr. Caplan called Mr. Katz; Mr. Katz said that Mrs. North had signed a will, but that he thought "it would be unethical" to disclose the contents; and this was reported to Mr. William Eisner. Mr. Caplan confirmed the fact that Mrs. Blechman had telephoned him about Mrs. North's jewelry, and fixed the date of this call as being not earlier than 30 November.

Mac Blechman, the husband of Geraldine, testified that "for the past fifteen years [he had visited Mrs. North] not too often;" that he had seen Mrs. North at the hospital on Sunday, 7 November and on four occasions thereafter; that Mrs. North had asked him about the "paper" as early as 7 November, but that he had done nothing about it because he thought she was talking about a hospital release form; that on Friday, 4 December, Mrs. North sent for him and told him:

> "[A]t this time, again, she said, 'I signed a piece of paper, I know I did wrong, and you must do something about it.' I said, 'Aunt Lil, I have no power to do anything.' She said, 'I want you to see, I trust you, I like you, and I have confidence in you.' She said, 'I want you to see that my money is given to the people who deserve it.' She said, 'Who should get my money.' We discussed this at great length. She thought that having one living brother, he should be entitled to a share of it; the child of a deceased brother, a share of it; and the four children of the other deceased brother, a share."

Mr. Blechman then went to his own attorney and had a will drawn, which named Mrs. Blechman as executrix (at Mrs. North's direction, he said) and conformed to these instructions. The better part of the day was devoted to this, and when Mr. Blechman returned to the hospital, Mrs. North's condition had deteriorated to a point where "she was not rational" and could neither understand nor sign the will.

At the conclusion of the caveators' case, the caveatees moved for a directed verdict on all 25 of the issues which had been transmitted by the orphans' court to the trial court. The lower court granted the motion as to issues Nos. 1, 4 and 6, which were as follows:

"1. Was the paper writing dated the 1st day of November, 1965, purporting to be the Last Will and Testament of Lillie E. North signed by her, or by some other person for her, in her presence and by her express direction, and attested and subscribed in her presence by two or more credible witnesses?"

"4. Was the said paper writing, dated the 1st day of November, 1965, and purporting to be the Last Will and Testament of the said Lillie E. North, executed by her when she was of sound and disposing mind and capable of executing a valid deed or contract?"

"6. Was the said paper writing, dated the 1st day of November, 1965, and purporting to be the Last Will and Testament of the said Lillie E. North, revoked after the execution thereof?"

The result of the court's ruling was to require the jury to answer issues Nos. 1 and 4 in the affirmative, issue No. 6 in the negative, and to postpone for later determination the remaining 22 issues, which, after being renumbered, read as follows:

"1. Were the contents of the said paper writing, dated the 1st day of November, 1965, purporting to be the Last Will and Testament of the said Lillie E. North, read to or by her, or known to her at or before the time of the alleged execution thereof?"

"2. Was the execution of the said paper writing, dated the 1st day of November, 1965, and purporting to be the Last Will and Testament of the said Lillie E. North, procured by undue influence exercised and practiced upon her?"

"3. Was the said paper writing, dated the 1st day of November, 1965, and purporting to be the Last Will and Testament of the said Lillie E. North, procured by fraud exercised and practiced upon her?"

"4. Is the said paper writing, bearing the date the 1st day of November, 1965, the Last Will and Testament of Lillie E. North?"

282

"5. Was Item 2, Paragraph (a) of the said paper writing dated the first day of November, 1965, purporting to be the Last Will and Testament of the said Lillie E. North, misunderstood by her at or before the time of the alleged execution thereof?"

"6. Was Item 2, Paragraph (b) of the said paper writing dated the first day of November, 1965, purporting to be the Last Will and Testament of the said Lillie E. North, misunderstood by her at or before the time of the alleged execution thereof?"

"7. Was Item 2, Paragraph (c) of the said paper writing dated the first day of November, 1965, purporting to be the Last Will and Testament of the said Lillie E. North, misunderstood by her at or before the time of the alleged execution thereof?"

"8. Was Item 2, Paragraph (d) of the said paper writing dated the first day of November, 1965, purporting to be the Last Will and Testament of the said Lillie E. North, misunderstood by her at or before the time of the alleged execution thereof?"

"9. Was Item 2, Paragraph (e) of the said paper writing dated the first day of November, 1965, purporting to be the Last Will and Testament of the said Lillie E. North, misunderstood by her at or before the time of the alleged execution thereof?"

"10. Was Item 2, Paragraph (f) of the said paper writing dated the first day of November, 1965, purporting to be the Last Will and Testament of the said Lillie E. North, misunderstood by her at or before the time of the alleged execution thereof?"

"11. Was Item 2, Paragraph (g) of the said paper writing dated the first day of November, 1965, purporting to be the Last Will and Testament of the said Lillie E. North, misunderstood by her at or before the time of the alleged execution thereof?"

"12. Was Item III of the said paper writing dated the first day of November, 1965, purporting to be the Last Will and Testament of the said Lillie E. North,

misunderstood by her at or before the time of the alleged execution thereof?"

"13. Was Item IV of the said paper writing dated the first day of November, 1965, purporting to be the Last Will and Testament of the said Lillie E. North, misunderstood by her at or before the time of the alleged execution thereof?"

"14. Was Item 2, Paragraph (a) of said paper writing dated the first day of November, 1965, purporting to be the Last Will and Testament of the said Lillie E. North, contrary to her instructions at or before the time of the alleged execution thereof?"

"15. Was Item 2, Paragraph (b) of the said paper writing dated the first day of November, 1965, purporting to be the Last Will and Testament of the said Lillie E. North, contrary to her instructions at or before the time of the alleged execution thereof?"

"16. Was Item 2, Paragraph (c) of the said paper writing dated the first day of November, 1965, purporting to be the Last Will and Testament of the said Lillie E. North, contrary to her instructions at or before the time of the alleged execution thereof?"

"17. Was Item 2, Paragraph (d) of the said paper writing dated the first day of November, 1965, purporting to be the Last Will and Testament of the said Lillie E. North, contrary to her instructions at or before the time of the alleged execution thereof?"

"18. Was Item 2, Paragraph (e) of the said paper writing dated the first day of November, 1965, purporting to be the Last Will and Testament of the said Lillie E. North, contrary to her instructions at or before the time of the alleged execution thereof?"

"19. Was Item 2, Paragraph (f) of the said paper writing dated the first day of November, 1965, purporting to be the Last Will and Testament of the said Lillie E. North, contrary to her instructions at or before the time of the alleged execution thereof?"

"20. Was Item 2, Paragraph (g) of the said paper writing dated the first day of November, 1965, pur-

porting to be the Last Will and Testament of the said Lillie E. North, contrary to her instructions at or before the time of the alleged execution thereof?"

"21. Was Item III of the said paper writing dated the first day of November, 1965, purporting to be the Last Will and Testament of the said Lillie E. North, contrary to her instructions at or before the time of the alleged execution thereof?"

"22. Was Item IV of the said paper writing dated the first day of November, 1965, purporting to be the Last Will and Testament of the said Lillie E. North, contrary to her instructions at or before the time of the alleged execution thereof?"

Because of the manner in which the issues are framed, it is desirable to set out the text of the will of 1 November 1965:

"I, Lillie E. North, of the City of Baltimore, State of Maryland, being of sound and disposing mind, memory and understanding, do hereby make, publish and declare this to be my Last Will and Testament, hereby revoking any and all former Wills or testamentary dispositions that may have been made by me.

### ITEM I

I direct my Executors hereinafter named to pay all my just debts and funeral expenses as soon as may be practical after my death and I desire to be buried in my family lot.

### ITEM II

I give and bequeath the following bequests:
(a) To my friend, Rose Sachs, the sum of $1,000
(b) To my niece, Marcia Eisner, daughter of my late brother, Daniel Eisner, the sum of $2,000
(c) To the Associated Jewish Charities the sum of $500
(d) To the Talmudical Academy the sum of $500
(e) To the Ner Israel Rabbinical College the sum of $500
(f) To the State of Israel the sum of $500
(g) To my attorney and friend, Gilbert I. Friedel, the sum of $3,000

## ITEM III

All the rest, residue and remainder of my estate, whether real, personal or mixed, wheresoever located, I do hereby give, devise and bequeath unto my brother, Irvin Eisner.

## ITEM IV

I do hereby nominate, constitute and appoint my brother, Irvin Eisner, and my attorney, Gilbert I. Friedel, to be the Executors of this, my Last Will and Testament, and request that they be excused from filing any bond.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this 1st day of November, 1965." (Signature and Attestation clause omitted.)

After the caveatees had completed their case, a motion was made in their behalf for a directed verdict on the remaining 22 issues. This motion was denied; neither party excepted to the court's charge to the jury; all 22 issues were submitted to the jury; and all 22 were answered adversely to the caveatees. Following the jury's verdict, the caveatees moved alternatively for a judgment *n.o.v.* or for a new trial, and this motion was denied. The present appeal followed.

The caveatees contend that the trial court was in error in refusing to direct a verdict in favor of the caveatees on all 22 issues submitted to the jury and in denying the caveatees' motion for a judgment *n.o.v.* after the jury had resolved all of the issues in favor of the caveators. We are not prepared to accept this argument in its entirety, but we do conclude that the caveatees' case was unquestionably prejudiced by the court's rulings.

The typical attack on the validity of a will is initially launched on familiar grounds: some irregularity in the factum of the will, lack of testamentary capacity, fraud, undue influence, or revocation of the instrument. The law presumes that every man is sane and has capacity to make a valid will, and the burden of proof rests upon those who allege to the contrary. Sykes, *op. cit.,* § 63 at 76-77, and cases cited in footnotes 16 and 17. The burden of proof is the caveator's when fraud is alleged, Sykes, §

102 at 155, *Griffith v. Diffenderffer,* 50 Md. 466, 482 (1879), as it is when undue influence is charged. Sykes, § 93 at 144, *Woodruff v. Linthicum,* 158 Md. 603, 608, 149 A. 454 (1930).

At the end of the caveators' case, the lower court, in our view quite properly, granted the caveatees' motion for a directed verdict with respect to issue No. 1 (signing and attestation) ; issue No. 4 (testamentary capacity) ; and issue No. 6 (revocation). This left for further determination renumbered issues No. 1 (knowledge of contents) ; No. 2 (undue influence) ; No. 3 (fraud) ; No. 4 (validity) ; Nos. 5 through 13 (understanding of specific provisions) ; and Nos. 14 through 22 (compliance with instructions).

For the reasons which follow, the lower court should have directed a verdict in favor of the caveatees on issue No. 2, undue influence; issue No. 3, fraud; and issues Nos. 14 through 22, compliance with instructions. Had the court directed verdicts on issues Nos. 2, 3 and 14 through 22, this would have left for the jury's consideration issue No. 1, knowledge of contents, issue No. 4, validity, and issues Nos. 5 through 13, understanding of specific provisions.

We stated the rule applicable to directed verdicts in caveat cases in *Ingalls v. Trustees,* 244 Md. 243, 247, 223 A. 2d 778, 779 (1966) : "In considering the facts, all conflicts in the evidence must be resolved in favor of the caveators and the Court must assume the truth of the evidence produced on their behalf as well as all reasonable inferences in favor of the caveators that may be drawn from the evidence." Cited with approval in *Waple v. Hall,* 248 Md. 642, 646, 238 A. 2d 544, 546 (1968), this follows *Smith v. Bernfeld,* 226 Md. 400, 174 A. 2d 53 (1961) and *Tufts v. Poore,* 219 Md. 1, 147 A. 2d 717 (1959). The evidence advanced by the caveatees, if uncontroverted, may also be taken into account. *Sachs v. Little,* 245 Md. 343, 363, 226 A. 2d 283 (1967).

### *Issue No. 2: Undue Influence*

There was no testimony which justified the submission to the jury of the issue which raised the question of undue influence. The testimony established that Mr. Irvin Eisner was not at the

hospital when the will was executed, and the court's comments in a colloquy in chambers are significant:

> "He [Irvin Eisner] was not there, so if he was using undue influence it had to be done through an agent and has to be some conspiracy. I have heard nothing to indicate that, no facts. You see, the influence he exerted, if I believe he did, and dominated this woman, it was at a time so remote from the place and time of the execution of the will, as to any, unless I see evidence otherwise."

The caveators made much of a rift which occurred between Mrs. North and Irvin's wife, Kate, over the hospitalization of Mrs. North's sister, Bessie. There was no indication that any of the resentment had been transferred to Irvin, and it is undisputed that Mrs. North called for Kate after the operation, that Kate was a regular visitor at the hospital, and, at least at times, fed Mrs. North. Completely unsupported by the caveators' witnesses is any charge that Mrs. North was influenced by or in behalf of the charitable legatees, by her niece Marcia, by her friend, Rose Sachs, or even by Mr. Friedel, to whom she might have left her entire estate, had it not been for his protests.

The caveators failed utterly to meet the burden of proof required under our decisions. There must be more than a suspicion that undue influence has been exercised. *Waple v. Hall, supra,* 248 Md. at 665, 238 A. 2d at 556. See, *Dudderar v. Dudderar,* 116 Md. 605, 620, 82 A. 453, 459 (1911) ; *Davis v. Calvert,* 5 G. & J. 269 (1833).

> "[U]ndue influence which will avoid a will must be unlawful on account of the manner and motive of its exertion, and must be exerted to such a degree as to amount to force or coercion, so that free agency of the testator is destroyed." *Stockslager v. Hartle,* 200 Md. 544, 547, 92 A. 2d 363 (1952).

See also, *Shearer v. Healy,* 247 Md. 11, 230 A. 2d 101 (1967) ; *Arbogast v. MacMillan,* 221 Md. 516, 158 A. 2d 97 (1960) ; *Koppal v. Soules,* 189 Md. 346, 56 A. 2d 48 (1947) ; *White v. Bramble,* 124 Md. 395, 92 A. 763 (1914) ; *Layman v. Conrey,* 60 Md. 286 (1883).

The caveatees contend that the lower court erred in permitting Mrs. Dahne to testify, despite their objection, that Mrs. North said "[t]hat Irvin [Eisner] pressured her [Mrs. North] into giving him things * * * and that she wanted us to have what was ours * * *." We regard this as admissible, *Griffith v. Benzinger,* 144 Md. 575, 125 A. 512 (1924); *Hamilton v. Hamilton,* 131 Md. 508, 102 A. 761 (1917), but of no probative value on the question of undue influence as regards the will.

*Issue No. 3: Fraud*

Turning now to the question of fraud, there is no evidence whatever or any inference to be drawn from the evidence which would justify a conclusion that Mrs. North did not know that she was signing a will on 1 November 1965 or that she was deceived or misled in regard to its provisions. As we indicated in *Giardina v. Wannen,* 228 Md. 116, 129, 179 A. 2d 357, 364 (1962) and reiterated in *Waple v. Hall, supra,* 248 Md. at 668:

> "Fraud connotes that the testatrix either did not know that she was signing a will, or that she was misled or deceived as to the provisions of the will."

The caveators introduced no testimony that Mrs. North did not know that she was signing a will at the time it was executed. The only evidence closely related in time to the signing of the will was the conversation in which she told Rose Sachs that she had made a will and indicated in a general way what the dispositive provisions were. Nowhere in the record is there a hint that Mrs. North was misled or deceived.

*Issues Nos. 14 through 22: Compliance with Instructions*

Issues Nos. 14 through 22 were designed to put to the jury a series of questions intended to develop whether each provision of the will was contrary to Mrs. North's instructions. While issues should not be multiplied unnecessarily, *Hamill v. Hamill,* 162 Md. 159, 168, 159 A. 247, 82 A. L. R. 878 (1932); *Taylor v. Nuttle,* 62 Md. 342, 344 (1884); *Sumwalt v. Sumwalt,* 52 Md. 338, 348 (1879), they must be so framed as to permit the jury to give a single answer to each question of fact submitted. *Bruton v. Smith,* 174 Md. 516, 199 A. 517 (1938). Not until

the decision of this Court in *Griffith v. Diffenderffer,* 50 Md. 466 (1879) was it possible to frame issues testing the validity of separate parts of a will, and even under that decision, only such provisions may be tested as are distinct and severable and can be taken from the will without subverting its general scheme and purpose. Sykes, *op. cit.* at p. 30, fn. 6; *Fisher v. Boyce,* 81 Md. 46, 51, 31 A. 707 (1895). The caveators, relying on *Munnikhuysen v. Magraw,* 35 Md. 280, 288 (1872) chose to frame issues testing each of the provisions against Mrs. North's intent.

Assuming, *arguendo,* that there was not an unnecessary multiplicity of issues, that the provisions to be tested were severable, and that the court's instruction[3] was adequate to guide the jury in distinguishing between the generality of issue No. 4 and the particularity of issues Nos. 14 through 22 (See, *Goeriz v. McNally,* 185 Md. 170, 44 A. 2d 446 (1945)) the caveators still were not entitled to have issues Nos. 14 through 22 tried by a jury.

There was no attempt to controvert Mr. Katz's testimony that he sat at Mrs. North's bedside, and, except for the preamble to the will, transcribed the provisions as Mrs. North dictated them. Accepting the truth of the testimony offered in behalf of the caveators that Mrs. North was not an orthodox Jew, seldom attended a synagogue, was not a Zionist, and was not on good terms with Irvin Eisner's wife, permits the drawing of no inference that the bequests to the Associated Jewish Charities, the Talmudical Academy, the Rabbinical College, the State of Israel or the appointment of her brother as executor were at variance with her instructions. The caveators' own witnesses told of her affection and concern for Marcia and of Mr. Friedel's professional relationship with her.

*Issue No. 1: Knowledge of Contents; Issues Nos. 5 through 13: Understanding of Specific Provisions*

The form of issue No. 1:

"Were the contents of the said paper writing, dated the 1st day of November 1965, purporting to be the

---

3. Neither of the parties excepted to the court's charge to the jury which is consequently not before us.

Last Will and Testament of the said Lillie E. North, read to or by her, or known to her at or before the time of the alleged execution thereof?"

has been before this Court in *Mitchell v. Slye,* 137 Md. 89, 111 A. 814 (1920); *Lyon v. Townsend,* 124 Md. 163, 91 A. 704 (1914); *Harris v. Hipsley,* 122 Md. 418, 437, 89 A. 852 (1914); and the rule of these cases is that a testatrix who properly executes a will, who is competent and who is shown to have read the will is presumed to have understood it. *Griffith v. Diffenderffer, supra; Taylor v. Creswell,* 45 Md. 422, 431 (1876).

Mrs. North's statements that she had signed a "paper," but did not know what it was raised a single question of fact to be determined by the jury: Did Mrs. North understand the will *when she executed it?*

"It is essential of course to the validity of every will, that the party making it should know and understand its contents, otherwise it is not his will. But where a person of *sound* mind executes a will, and the same is his *free and voluntary act,* the law presumes knowledge on his part of its contents. This presumption, it is true, may be rebutted by the facts and circumstances surrounding its execution, and cases may arise in which it is proper to submit to the jury the distinct question, whether the testator understood its contents. Where, for instance, there are suspicious circumstances surrounding the execution of a will, made by a person suffering from extreme debility arising from old age or sickness, especially if he could neither read nor write; or where a will is prepared by a person standing in a confidential relation, and who is largely benefited by it, or even where the testator is of sound mind, if there be proof to show that he did not understand its contents, an extreme case, however, in these and other like instances, it may be proper for the jury to find affirmatively, that the testator understood the contents of the will." *Taylor v. Creswell, supra,* 45 Md. at 431.

But see, *Baker v. Baltimore Trust Co.,* 154 Md. 390, 140 A. 599 (1928).

Relying on this rule, this Court has approved the instruction:

> "[If the jury finds that] Mrs. Caroline Naudain executed the paper offered in evidence as her will in the manner testified to by the subscribing witnesses, and also find that on the evening before the will was executed Nelson E. Whitaker read the same over to her, and shall also find that at the time of the execution of the will she was capable of understanding the business in which she was engaged and of executing a valid deed or contract, then the legal presumption is that she knew and understood the contents of the paper." *Naudain v. Coudon,* 91 Md. 121, 127-28, 46 A. 314 (1900).

At the close of the caveators' case, the lower court directed a verdict in the caveatees' favor on the issues of signing and attestation and testamentary capacity. Mr. Katz testified that he virtually transcribed Mrs. North's dictation, and that when the will was completed, it was both read *to* her and *by* her, and this testimony was not challenged. Consequently, a presumption of understanding arose, which could be rebutted by the caveators. The question for the jury's determination was whether Mrs. North's repeated reference to the "paper" which she had signed, the contents of which she did not remember, and her conversation with Mac Blechman, on 4 December with respect to preparing a new will, when equated with Mrs. North's conversation with Rose Sachs, which seems to have taken place after 1 November, would support a conclusion that she did not understand the contents of the 1 November will at the time it was executed, or, alternatively, lends support to the conclusion that she simply desired to revise the will.

As we view this case, the only question of fact which properly should have been submitted to the jury was a narrow one: whether Mrs. North knew and understood the provisions of the will at or before the time she signed it. Only renumbered issues Nos. 1, 4 and 5 through 13 should have been submitted to the jury for determination, since these were the only ones relevant to the question. Additional issues Nos. 5 through 13 are broader

292

in scope than issues Nos. 1 and 4. As Judge Henderson, speaking for the Court, said in *Goertz v. McNally, supra:*

> "It is true that under the additional issues the jury might find all parts of the will and codicil invalid, and in that event the answers to all the issues would reach the same result, but this possibility presents no practical difficulties. Even in a case where issues are completely duplicitous the answers can be molded, under appropriate instructions from the trial court, so as to effectuate the jury's ultimate finding of fact. *Holland v. Enright,* 167 Md. 604, 175 A. 466." 185 Md. at 173.

The court's failure to grant the caveatees' motion for a directed verdict on issues Nos. 2, 3 and 14 through 22 was not only error, but the improper submission of these issues to the jury was clearly prejudicial to the caveatees. The case is therefore remanded for trial on issues Nos. 1, 4 and 5 through 13.

> *Order reversed; remanded for further proceedings in conformity herewith; costs to abide the result.*