ELEANOR LINTHICUM WOODRUFF *v.* SETH H. LINTHICUM et al., Executors.

[No. 14, January Term, 1930.]

604

*Decided March 12th, 1930.*

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, and SLOAN, JJ.

*Edward L. Ward* and *Ridgely P. Melvin,* for the appellant.

*Nicholas H. Green,* for the appellees.

OFFUTT, J., delivered the opinion of the Court.

Sarah L. Linthicum, after a lingering illness, died at her home at Linthicum Heights in Anne Arundel County, on May 24th, 1927, in the fifty-ninth year of her age. She left to survive her two daughters, Sarah Louise Linthicum and Eleanor Linthicum Woodruff, and Sweetzer Linthicum, Jr., who was the father of her children and from whom she had been divorced on March 1st, 1926.

Mrs. Linthicum, then Miss Crisp, was married to Sweetzer Linthicum, Jr., on November 20th, 1888. After their marriage they moved into the home at Linthicum Heights, which had just been completed and where she was living at her death. Their children were born there, and there she and her husband lived together until their separation in 1925.

The earlier years of the marriage seem to have been reasonably happy. Mrs. Linthicum was an affectionate wife, a devoted mother, a careful manager, bright and happy in her nature, deeply interested in her home, and the most pervasive and persistent impression she appears to have left with those who knew her best was that she always wanted to do the right thing. While the record is silent as to Sweetzer's conduct prior to 1915, it contains nothing to support the inference that he was not a kind and affectionate husband and father, and his wife's apparent affection for him indicated that he was.

The first break in their relations came some ten years prior to her death. At that time her health began to fail, and at or about that time she discovered evidence of an illicit amour between her husband and one Edith Kaline. When she spoke to him of his relation with Miss Kaline, he said he would stop "going with her"; and his wife did not know he had broken his promise until September, 1925, when she again became convinced that his relations with Miss Kaline, if they had ever been broken, had been resumed. Again she spoke to him of his relations with the woman, and said that she was going to see her. On that occasion he denied any misconduct, but his denial evidently did not allay his wife's suspicion, for from then on every time she saw him she "talked with him" to "find out if it was so." But it may be inferred that even then she was on friendly terms with her husband, for on Labor Day, which fell on September 7th, in 1925, she called on her friend Miss Georgia Allen Hutton, who conducted a sanatorium in Baltimore, and told her that Sweetzer had gone to Fairfield to collect some rents, and that she, Mrs. Linthicum, had told him that because it was so hot she would not go with him, but for him to bring her the paper and "go home to dinner," and that when the paper came the front page was missing. At that time Miss Hutton knew, what Mrs. Linthicum did not, that on the missing page was an account of the bigamous marriage of Sweetzer Linthicum and Miss Kaline, which had taken place

at Elkton on September 2nd, 1925, and she too tore the front page from the paper before giving it to Mrs. Linthicum. But on the following morning Mrs. Linthicum summoned Miss Hutton, and showed her the same article in the morning paper. She was crying, hysterical, and in a state of collapse, and Miss Hutton at once telephoned for Mrs. Woodruff and Dr. Milton Linthicum, and then took her to her home in Linthicum Heights. When they arrived there, they found Sweetzer, and notwithstanding what had occurred he remained for a week or two before he left. On September 24th, 1925, Mrs. Linthicum filed a bill for an absolute divorce from him, and on March 1st, 1926, a final decree granting her that relief was entered in the Circuit Court for Anne Arundel County.

It was after these shocking and distressing experiences that Mrs. Linthicum came, on October 20th, 1925, to make the will which is the subject of this litigation, and in which she made the following disposition of her estate: To her daughter Sarah Louise she left $15,000, in trust for the use of Sweetzer Linthicum, Jr., for his life, and then to Sarah Louise Linthicum and Eleanor Woodruff, share and share alike, with power to the trustee to use the corpus to insure an annual income of $900 to Sweetzer. To Sarah Louise $10,000 for her life, so long as she remained unmarried, and, in the event of her marriage, then to her and Eleanor share and share alike, and in the event of the death of Sarah unmarried, then to Eleanor if living, and if not to her children absolutely. To Sarah Louise Linthicum, the home place with its contents, charged however with the right of Sweetzer to live thereon "should he be unmarried," unless he and his daughter Sarah should agree to the contrary. To Eleanor Linthicum Woodruff, $12,000. To the two daughters all the residue of her property, share and share alike. Seth H. Linthicum, her brother-in-law, and Sarah Louise Linthicum, her daughter, were appointed executors.

On June 2nd, 1927, the will was admited to probate in the Orphans' Court of Anne Arundel County, and letters testa-

mentary issued thereon to Seth H. Linthicum and Sarah L. Linthicum, the appellees in this case. On September 9th, 1927, Eleanor Linthicum Woodruff filed in that court a caveat, in which she alleged (1) that the will had not been properly executed, (2) that it was not executed when Mrs. Linthicum was of sound and disposing mind, and capable of executing a valid deed or contract, (3) that its execution was procured by undue influence exercised and practiced upon the testatrix and constraining her will thereto, (4) that its execution was procured by fraud exercised and practiced upon Mrs. Linthicum and constraining her will thereto, and (5) that she did not know or understand its contents. As a result of further pleadings, issues presenting those questions in the order in which they have been stated were framed and transmitted to the Circuit Court for Anne Arundel County for trial.

At the conclusion of the case for the caveator, the court directed a verdict for the caveatees on the first, third, and fourth issues, which left for the consideration of the jury the second and fifth issues, relating respectively to testamentary capacity, and the testatrix's knowledge of the contents of the will. The verdict of the jury being for the caveatees on both of those issues, the caveator appealed. No objection has been made in this court to the action of the trial court in respect to the first and fourth issues, so that the single question presented by the appeal is whether the evidence offered at the trial of the case was legally sufficient to show that the will was procured by undue influence exercised and practiced upon the testatrix.

The law concerning the degree and nature of the influence, which, if exerted upon one to induce him to make a deed, contract, or will, must be characterized as undue, has long since crystalized into a formula, which in *Higgins v. Carlton,* 28 Md. 123, 144, is thus stated: "That the undue influence which will avoid a will must be an unlawful influence, on account of the manner and motive of its exertion, and must be exerted to such a degree as to amount to force or coercion,

destroying free agency; it must not be the influence of affection or attachment, nor the mere desire of gratifying the wishes of another, for that would be a very strong ground in favor of a testamentary act; and there must be satisfactory proof that the will was obtained by this coercion, or by importunities which could not be resisted, so that the motive was tantamount to force or fear."

Every person having testamentary capacity has, under the laws of this state, the right to dispose of his estate by will (Code, art. 93, sec. 328), and when a will made in the exercise of that right has been duly executed in compliance with the formalities prescribed by the statute (Code, art. 93, sec. 332), ordinarily it will be presumed that it is the will of the testator. And one attacking it on the ground that it was procured by undue influence carries the burden of establishing that fact. *Tyson v. Tyson,* 37 Md. 567. If it should appear that the testator did not at the time the will was executed possess the requisite testamentary capacity, or that, being mentally competent, he executed it under compulsion or as a result of fraud, the instrument will be set aside, for in such a case it would not be his will; it would be either no will at all or the will of another. *Boyce v. Rossborough,* 6 H. L. C. 41. But since the law gives to every person possessing the requisite testamentary capacity the right to make a will, when in the exercise of that right he does make one, after complying with all the formal requisites prescribed by the statute, it will not be set aside on the ground that it was procured by undue influence, unless it shall affirmatively appear that it was "executed by him against his will, in obedience to a dominion or control exercised over him and which he was unable to resist." *Tyson v. Tyson, supra.* It is not enough to show a mere suspicion that the will was procured by undue influence exercised and practiced upon the testator (*Kennedy v. Dickey,* 100 Md. 164; *Beyer v. LeFevre,* 186 U. S. 125; *Smith v. Shuppner,* 125 Md. 416), or even that a person had the "power unduly to overbear the will of the testator" (*Baudains v. Richardson* [1906], A. C. 185), but it must

appear that the power was actually exercised, and that by means of its exercise the supposed will was produced. *Ibid.* These general principles were recognized in the leading case of *Davis v. Calvert,* 5 G. & J. 301, and since that case (1833) in varying phraseology have often been affirmed and restated by this court. *Layman v. Conrey,* 60 Md. 286; *Hiss v. Weik,* 78 Md. 439; *Griffith v. Benzinger,* 144 Md. 583; *Longanecker v. Sowers,* 148 Md. 588; *Bowers v. Kutz-leb,* 149 Md. 315.

Turning to the facts, there is not the slightest evidence, direct or circumstantial, that the will in this case was not the free voluntary and deliberate act of Mrs. Linthicum, or that any one exercised any influence of any character upon her to procure it. The only persons interested in it are her daughters, Seth H. Linthicum, and Sweetzer Linthicum, Jr. But it is not even contended that Sweetzer Linthicum, Jr., her former husband, by word or act induced its execution, since at the time it was executed they were living apart, and it does not appear that prior to her death he knew of its existence. It was suggested at the argument that Seth H. Linthicum, his brother, may have influenced her in making it, and it was intimated that he may have drawn it. Not only does the evidence fail to support either inference, but it does affirmatively appear that when it was attested the will was in the possession of the testator in her own home, at that time Seth H. Linthicum was not present, and that at least one of the attesting witnesses was present in response to a request of the testatrix herself, made a day or two before, for the sole purpose of witnessing it.

But the principal, if not the only, contention of the appellant is that the provisions of the will are so unnatural, and so repugnant to the known wishes and intent of the testator, that they themselves furnish evidence legally sufficient to permit the inference that it was procured by undue influence.

That contention appears to be based upon the fact that the will provides for an annuity of $900 a year to Sweetzer

Linthicum, Jr., and permits him to live in his old home during his "natural life" so long as he remains unmarried. A sufficient answer to that contention would be that the provisions of a will, no matter how unnatural or unjust they may be, are not in themselves, unaccompanied by extrinsic facts indicating that the execution of the will was the result of some influence or pressure exerted upon the testator, sufficient to create an inference that it was procured by undue influence. *Alexander on Wills,* sec. 585; 28 *R. C. L.* 149; *Meier v. Buchter,* 197 Mo: 68, 7 Ann. Cas. 894, note; *Mallow v. Walker,* 115 Iowa, 238, 91 A. S. R. 160; *McElhinney v. Swepston* (Tex.), 263 S. W. 940; *Underhill on Wills,* sec. 135. For if that were not so, no will would be safe from attack by disappointed relatives, who could point to some inequality or assumed injustice in its provisions, and the right to dispose of property would not rest in the owner thereof, but in some court or jury, whose ideas of justice, equality, or propriety might differ from his.

The appellant relied upon the case of *Frush v. Green,* 86 Md. 494, as supporting a different conclusion. But an examination of that case shows that it has no such effect. What it decided was that the fact that the deed in that case suddenly reversed the grantor's expressed intentions was sufficient to "suggest" undue influence, not that standing alone it would have been legally sufficient proof of such influence. The same comment may also be made upon the cases of *Grove v. Spiker,* 72 Md. 300; *Smith v. Shuppner, supra;* and *Longanecker v. Sowers, supra,* cited to the same point.

Nor can we say that the provisions of the will are so unnatural or so repugnant to the known wishes of the testatrix as to warrant even the suspicion that its execution was procured by undue influence.

Appellant's contention is that, at the time she executed the will, the testatrix, as a result of the humiliation and the injury which she had suffered as a result of his criminal and disgraceful conduct, must have cherished such feelings of resentment and enmity towards the man who was still

her husband, that it may reasonably be inferred that she would not have made those provisions for his benefit which the will contains, except as the result of some unlawful influence. But in that they do her less than justice. Mrs. Linthicum possessed a character singularly free from the harsh and vengeful sentiments which the appellant attributes to her. It was indeed natural that she should have deeply resented the humiliation and the affront which her husband had put upon her. In the years of her strength she had given of it freely for the welfare of her home, her husband, and her children. So that when her strength began to fail, and she was attacked by the painful and distressing disease to which she eventually succumbed, it was but natural that she should have felt the keenest resentment against the husband who turned from her in her need to contract an unlawful liason with another woman. And if there were nothing else in the case, the generous provision which she made in her will for the maintenance of the man who had so deeply wounded her would be so unnatural as to excite suspicion. But there are other facts in the case, which are not contradicted, and which lead inevitably to the conclusion that, so far from being unnatural, what she did was characteristic of her and consistent with her whole life.

Much if not all of the property which she possessed at her death had been granted to her by her husband. It is intimated that he put it in her name to place it beyond the reach of possible creditors, and that she had spent her money in paying his debts, but, whatever the reason for it may have been, it is undisputed that she had received a very large part of her estate from her husband. It is also undisputed that, not only was she deeply religious, but that the ruling and dominant note of her character was fairness and justice. She wanted at all times to be scrupulously and exactly just. In her treatment of her children she avoided anything which savored of partiality or which could indicate a preference between them. She carried that so far that, on one occasion, when she gave Louise a trip to Europe, she gave Eleanor $600

612

as an equivalent, and, as she did not pay her that at once, when she did actually pay it to her she added interest. Her sister, Mrs. Sinton, said that she was a "fair and square woman," that she believed in "fairness," "that when she thought a thing was right she would do it." Miss Hutton, her life long friend, said that she always wanted to be "fair and square and just." It is undisputed too that, notwithstanding her husband's conduct, she never ceased to take an interest in him. It is true that at different times she said she could not forgive him, that she expressed the deepest hatred and dislike for "the action" of her husband and when asked whether she still cared for him, she said "I am perfectly cold, how could I care for a man who has humiliated me as he has." But her actions were inconsistent with her words. Even after the divorce, with her consent, he visited her at her home; when he was living at Conowingo she herself went there to see him; when he was in Florida she sent him the money to enable him to come to see her; and when, on one of these visits, towards the end, he asked her to forgive him, she said, "I can't forgive, only God can forgive." It also appears that she was conscious that he was in a measure dependent upon her, for when her friend Mrs. Addison asked her, "What is he going to do?" she answered, "He has nothing but what I choose to give him." And when asked "Are you going to see him suffer?" she replied, "I am not going to worry anything about him, he has made his own life, and he will have to live it, but his children will not see him suffer."

So, after it was no longer possible to doubt her husband's guilt, when she came to make her will she knew that she could in a measure punish him for his fault by failing to make any provision for his maintenance, but she knew too that the power to do that had come from him when he placed the property in her name, and the question she faced was whether it would be just, as she measured justice, to do that. And that she should have preferred to do what she believed to be fair and just, rather than to punish, was so consistent with her past life, as to seem not only natural but inevitable.

After her death, a letter from her addressed to her daughter Sarah Louise was found and opened. In it she said: "When death come get George Hutton or woman from undertakers to lay me out. I hope no one looks at me, one of my own dresses is good enough to put on me. I want no other. But the plainest coffin. I want no pallbearers, take me to St. Paul's Church, have the full choir, pay for it out of my money. I want the hymns, Jesus, Lover of My Soul, and Abide with Me, sung. Put me in the family vault at Greenmount, keep me there for one week then have my body cremated, don't save my ashes, if you don't want it you may not. I have left Louise a few hundred dollars more of my income each year than Eleanor. I do not want her to have to go out into the world to work. She has had me to look after, I thought it only justice to give it to her. I hope by God's help I am right, if anything by misfortune should happen to Lynn I hope Louise will give part of it back to Eleanor. When I am gone I hope to be forgotten. I do not want any kind of memorials. Have Smith to take care of my funeral. Sarah L. Linthicum."

From that letter appellant infers that, as it does not mention Sweetzer or any provision for his benefit, she did not know of the provisions made for him in the will, or intend that they should take effect. But it is conceded that she knew and understood the will, and it was executed more than eighteen months before her death, and,she permitted it to stand unchanged.

But the statement itself is not that of one who was angry or resentful, but that of a woman who was sad and broken and tired. She had lived justly, she had been faithful to her trusts, her reward had been the bitterest disappointment and humiliation, she was suffering from a fatal and wasting disease, life held little for her, she wanted to forget and to be forgotten, and going she wanted neither to punish nor to reward but to be just.

Nor does the evidence sustain the contention that the will was contrary to the expressed intention of the testator. There

is no evidence that she ever expressed an intention not to make any provision for Sweetzer in her will, but there is abundant evidence that she did intend to treat her two daughters alike, except that she desired to secure to her unmarried daughter an annual allowance, that she might not be required "to go out in the world to work." And the will substantially executes that intention.

Aside from a life interest in the $10,000 fund bequeathed to Sarah, the only evidence of any difference in the value of the property and funds which the will gives to the two daughters of the testatrix is the opinion of a real estate broker that the home place devised to Sarah was worth $8,000 more than the $12,000 in cash bequeathed to Eleanor. But in view of the fact that the testatrix was apprehensive that Sarah, who was unmarried, might find it more difficult to support herself than her married sister, and that she was conscious that Sarah had remained at home and cared for her, we find nothing in that disparity to suggest undue influence.

After a full and careful examination of the record, we have been unable to discover anything which could possibly be described as evidence legally sufficient to support the hypothesis that the will which is the subject of this appeal was procured by undue influence, and the ruling appealed from will be affirmed.

*Ruling affirmed.*