LUCILLE KOPPAL, ET AL. *v.* KATHERINE FRANCES SOULES, ET AL.

[No. 38, October Term, 1947.]

*Decided December 10, 1947.*

The cause was argued before MARBURY, C. J., and DELAPLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*Roscoe H. Parker*, with whom were *Bird H. Dolby* and *Dolby & Parker* on the brief, for the appellants.

*S. Marvin Peach* for the appellees.

HENDERSON, J., delivered the opinion of the Court.

The appeal in this case is from an order of the Orphans' Court for Prince George's County declaring that the will of Frances Agnes Koppal was procured by

348

undue influence, and refusing probate. The case had been submitted to the Judges of that court for determination without issues to a court of law, as in *Cramer v Crumbaugh,* 3 Md. 491.

The decedent was a widow 56 years of age. She resided at 3900 Bunker Hill Road, Brentwood, Maryland, in a two story frame house which she owned. The house was worth about $9,000, over and above a $3,000 mortgage. The second floor had been converted into an apartment which was rented to a Mr. and Mrs. Stubblefield for $45 per month. The decedent occupied the first floor with her youngest son, Raymond, who paid her $15 a week for his room and board. Except for the house and its furnishings she left no other property.

The decedent was survived by four heirs: A married daughter, Katherine Soules of Brentwood; a married son, Joseph Koppal, of Newcastle, Delaware; an unmarried son, Raymond Koppal; and a grandson, Barry Koppal, the five year old son of a deceased son, George Koppal, who was killed in France. Barry Koppal lived in Brentwood with his mother Lucille Koppal, who was the sister of Julia Roe. Julia was engaged to Raymond Koppal.

The decedent had suffered from diabetes and a weak heart for about ten years prior to her death, and was partially blind. On November 28, 1946, at about 10:30 P.M., she executed a will in which she purported to "bequith" her home and contents to her son, Raymond, and a cedar chest and contents to her daughter, Katherine. About two hours later she was taken to a hospital in an ambulance, but died on the way, from "heart failure," at about 12:30 A.M. on the morning of November 29, 1946.

Before the will was offered for probate, Katherine Soules filed a caveat alleging mental incapacity and undue influence. Joseph Koppal joined in the caveat. Raymond Koppal filed an answer denying these allegations, and Barry Koppal, through his mother and next friend, Lucille Koppal, did the same.

It appears from the testimony that about two weeks [two months according to other testimony] before the death of the testatrix a housemaid, Lillian Blake, had been laid off or discharged and that Julia Roe, Raymond's fiancée, came to reside with the testatrix and look after her. On November 28, Thanksgiving Day, the testatrix prepared a large midday dinner. About 8 P.M. her daughter, Katherine Soules, called to see her. "She came to the door and let me in. I thought she looked better." Julia and Raymond came in as Katherine was leaving. Julia testified that the decedent told her she was feeling badly and wanted to make a will; she requested Julia to call the Stubblefields from upstairs. They were not at home, but came in about 10 o'clock. Sarafina Stubblefield testified that when she came in with her husband, Mrs. Koppal requested her to write a will at her dictation. She did so, and thereafter the testatrix signed her name and the Stubblefields each signed as witnesses. Mrs. Stubblefield and her husband both testified that Mrs. Koppal was perfectly rational, although she said "she wasn't feling well," and stated that she wanted to leave her house to Raymond; that she knew he would look after Barry and give him a home; that Katherine had a home of her own, and that Joseph had received his share when his father died. Raymond and Julia were present when this statement was made. After the will was executed, Mrs. Koppal complained of "feeling worse," and Raymond tried, unsuccessfully, to get a Doctor to attend her. After several attempts he got Dr. Dunn on the 'phone, who was unable to come, but made arrangements for an ambulance to take her to a hospital, and for her admittance. The ambulance attendant testified that when he arrived, about 12:15 A.M., Mrs. Koppal was conscious and rational, although she seemed to be in pain. Upon this testimony the Orphans' Court found, correctly we think, that there was no showing of a want of mental capacity on the part of the testatrix.

None of the foregoing testimony was contradicted by the caveators. They testified, however, that at various

times prior to Mrs. Koppal's death she told them she was going to leave her property, except for a chest which was to be Katherine's, to her heirs in equal shares. Lillian Blake and a neighbor, Mrs. Pauls, testified to similar statements by the decedent. Julia Roe and her sister, Lucille Koppal, testified that the decedent always told them that Raymond was to have the house. A Mrs. Allison, a neighbor and lifelong friend of Mrs. Koppal, testified that the decedent told her in August, 1946, that she had decided to leave the house to Raymond, and that she was confident he would give Barry a home. At the time of the trial Raymond had married Julia, and Lucille and Barry were living with them. Several witnesses testified that the testatrix had been opposed, at one time, to this marriage, but it was not disputed that she knew of the engagement and had asked Julia to live with her and help her. Katherine Soules testified that the decedent told her Julia "was always fishing around trying to get her to leave the house to Raymond." Julia denied this.

The only other pertinent testimony produced by the caveators was to the effect that although Raymond told them about the will before the funeral, he subsequently agreed to a sale and division of the proceeds, but refused to carry out his agreement when he was advised that the will would have to be filed in court and set aside on the ground that the testatrix was incompetent. Raymond testified that he agreed to a division only because he believed, at that time, that the will was invalid because not drawn by a lawyer or "notarized". The appellees do not contend that Raymond's agreement to divide is legally enforceable. If Raymond did, in fact, believe that the will was invalid, such a belief would tend to negative any inference that he procured its execution. There was no evidence of importunity on his part.

Accepting the testimony of the appellees at its face value, it shows no more than a change of intention on the part of the decedent. As this court said in *Malone v. Malone*, 148 Md. 200, 206, 129 A. 10, 12: "We do not conceive that a change of intention is *per se* an indication of

undue influence, when there is nothing to show that the change of mind was due to improper constraint." The burden of proof of undue influence was upon the caveators. *Woodruff v. Linthicum,* 158 Md. 603, 608, 149 A. 454; *Tyson v Tyson,* 37 Md. 567; *Higgins v Carlton,* 28 Md. 115, 123, 144, 92 Am. Dec. 666. In the latter case it was said: "the undue influence which will avoid a will must be an unlawful influence, on account of the manner and motive of its exertion, and must be exerted to such a degree as to amount to force or coercion, destroying free agency; * * * and there must be satisfactory proof that the will was obtained by this coercion, or by importunities which could not be resisted, so that the motive was tantamount to force or fear." In *Woodruff v. Linthicum, supra,* it was said [158 Md. 603, 149 A. 456]: "It is not enough to show a mere suspicion that the will was procured by undue influence exercised and practiced upon the testator * * * or even that a person had the 'power unduly to overbear the will of the testator' * * * but it must appear that the power was actually exercised, and that by means of its exercise the supposed will was produced." See also *Drury v. King,* 182 Md. 64, 32 A. 2d 371 and *Birchett v. Smith,* 150 Md. 369, 133 A. 117.

The appellees invoke the doctrine of confidential relations to shift the burden of proof. That equitable doctrine has often been applied in the case of gifts *inter vivos,* particularly where the donor strips himself of the enjoyment of his property while living (*Myers v. Myers,* 185 Md. 210, 211, 44 A. 2d 455; *Zimmerman v. Hull,* 155 Md. 230, 141 A. 531); but it does not apply in the case of a devise or bequest from a parent to a child *(Tyson v. Tyson, supra),* if, indeed, it has any application to testamentary dispositions. *Tyson v. Tyson, supra; Griffith v. Diffenderffer,* 50 Md. 466, 484; *Cook v. Hollyday,* 185 Md. 656, 667, 45 A. 2d 761. But see *Page, Wills,* Lifetime Ed., secs. 818, 821; Notes 66 *A. L. R.* 228; 154 *A. L. R.* 583, and 21 *Cornell L. Q.* 80. Even in the case of gifts *inter vivos,* it has been held that the mere relationship of parent and child between the donor and donee does

not establish a confidential relation or shift the burden of proof. *Williams v. Robinson,* 183 Md. 117, 36 A. 2d 547; *Snyder v. Hammer,* 180 Md. 690, 23 A. 2d 653; *Gaver v. Gaver,* 176 Md. 171, 186, 4 A. 2d 132; *Taylor v. Pivec,* 149 Md. 526, 131 A. 757; *Henry v. Leech,* 123 Md. 436, 91 A. 694; *Eakle v. Reynolds,* 54 Md. 305.

In the case at bar we hold that the caveators have not only failed to meet the burden of proof, but have produced no evidence legally sufficient to establish undue influence. The fact that Raymond and Julia were present when the will was dictated would not support an inference of influence on their part. There was no evidence of importunity on Raymond's part, and the testimony as to Julia's previous importunity is not sufficient to show coercion. *Benedict v. Warehime,* 187 Md. 150, 49 A. 2d 444, 448; *Kennedy v. Dickey,* 100 Md. 152, 154, 59 A. 661, 68 L. R. A. 317; *Somers v. McCready,* 96 Md. 437, 438, 53 A. 1117; *Wittman v. Goodhand,* 26 Md. 95, 105; *Davis v. Calvert,* 5 Gill & J. 269, 25 Am. Dec. 282. We think the preference by the testatrix of one heir over the others, under the circumstances, was not so unjust or unnatural as to support an inference of undue influence within the doctrine of *Hiss v. Weik,* 76 Md. 439, 447. Compare *Finch v. Lee,* 184 Md. 98, 40 A. 2d 371, and *Mecutchen v. Gigous,* 150 Md. 79, 132 A. 425. Since our conclusion upon the facts is contrary to that of the Orphans' Court, we must reverse the order appealed from.

*Order reversed, with costs.*