*Mary Caroline Zook v. Susan M. Pesce*, Case No. 75, September Term, 2013, Opinion by Adkins, J.

**MD. CODE (1974, 2013 REPL. VOL.), § 9-108 OF THE COURTS AND JUDICIAL PROCEEDINGS ARTICLE — ATTORNEY-CLIENT PRIVILEGE — TESTAMENTARY EXCEPTION:** Because the Testamentary Exception to the attorney-client privilege exists in Maryland, the Circuit Court for Prince George's County erred by denying Petitioner discovery access to a previous living trust and the ability to question witnesses on the basis of the document. Nonetheless, under the circumstances, Petitioner is not entitled to a new trial.

Circuit Court for Prince George's County
Case No. CAL10-26897
Argued: March 11, 2014

IN THE COURT OF APPEALS

OF MARYLAND

No. 75

September Term, 2013

---

MARY CAROLINE ZOOK

v.

SUSAN M. PESCE

---

Barbera, C.J.
Harrell
Battaglia
Greene
Adkins
McDonald
Wilner, Alan M. (Retired,
 Specially Assigned),

JJ.

---

Opinion by Adkins, J.

---

Filed: May 16, 2014

In this contest between two siblings, we consider the testamentary exception to the attorney-client privilege. Though both parties urge us to recognize this exception, they disagree on whether it was properly applied in this case. In the course of resolving this dispute, we will take this opportunity to more clearly illustrate when and how the exception applies.

## FACTS AND LEGAL PROCEEDINGS

Eugene D. Zook ("the Decedent") died on December 24, 2008, after succumbing to prostate cancer at age 81. At the time of his death, the Decedent had three living adult children: Dennis Eugene Zook, Susan M. Pesce ("Respondent"), and Mary Caroline Zook ("Petitioner"). On November 20, 2007, the Decedent, with the help of attorney, Thomas P. Downs ("Downs"), set up the Eugene D. Zook Living Trust ("the 2007 Living Trust"). The Decedent amended the Living Trust on December 2, 2008 ("the 2008 Living Trust"), twenty-two days before his death. The instrument designated Respondent as the trustee of the Living Trust.

Article Seven of the 2008 Living Trust specified that each of the Decedent's three children were to receive a one-third share of all remaining trust property. Although the distribution of the trust assets was equal, each heir's access to his or her share was not. Whereas the 2008 Living Trust directed the trustee to distribute the shares of Dennis Zook and Susan Pesce outright and free of trust, the trustee was directed to maintain in trust

Petitioner's share according to specific terms and conditions.[1]

On August 10, 2010, Petitioner, acting *pro se*, filed a "Complaint For Inspection Of Records" ("the Complaint") in the Circuit Court for Prince George's County against Pesce, Downs, Dennis Zook, and Catherine Zook, Dennis's wife. The Complaint offered 18 counts, appearing to question the validity of the 2008 Living Trust.[2]

_____

[1]Specifically, Section 7.04(a) of the Living Trust stated:

> As soon as practical after my death, my Trustee shall provide Mary Caroline Zook with $2,000.00 of principal from this share. My Trustee shall thereafter distribute to Mary Caroline Zook twenty payments in approximately equal amounts over a ten year period payment on June 1 and December 1.
>
> In the alternative, my Trustee may purchase an unassignable annuity to accomplish the same payment schedule.
>
> Any undistributed net income shall be accumulated and added to principal.

[2]The listed "details of the complaint" were:

> 1) Failure to inform me of initial meeting of the opening of the Trust.
>
> 2) Failure to provide me with a copy of the original Trust Dated 11/20/07 after repeated requests for a copy[.]
>
> 3) Failure to inform me my father was in the Hospital for a week on his death bed until the day of his death.
>
> 4) Failure to provide me with accurate accounting for the Trust Dated 11/20/07[.]
>
> 5) Creating a new Trust 12/02/08 when my father was of not

(continued...)

sound mind or physically able to do so all with the ANTICIPATION of his death. Also, his questionable signature and ability to read said new Trust. He died 12/24/08.

6) Failure to provide an accounting of vehicles, his large coin collection, life insurance policies & contents of his home etc. at 12200 Myrtle Ave., Beltsville, MD 20705 or 41 Gum Circle, Ocean View, DE 19970 his beach residence. Failure to provide an accounting of all of his assets.

7) Failure to cease and desist the sale of my parent's home at 12200 Myrtle Ave., Beltsville, MD 20705 after a letter was written to the court for guidance in this matter[.]

8) Failure to respond to repeated requests for information[.]

9) Failure to provide information regarding questionable documentations I finally received[.]

10) Removal of information from 2008 tax return plus inaccurate names and addresses[.]

11) Failure to inform regarding out of state property[.]

12) Failure to inform regarding status of Lot #8 Block A Ocean View, Delaware, 19970[.]

13) Failure to file Trust in Prince George's County.

14) Failure to inform me where Trust was filed after repeated requests if it was filed[.]

15) Removal of funds from interest bearing account to a non interest bearing account[.]

16) Threatening me in writing with contest clause if I don't cash

(continued...)

Pesce admitted the allegations of paragraphs 1, 2, 3, 7, and 13, denied 4–6, 8–12, and 14–18, and requested the Complaint be dismissed for, among other reasons, failure to state a claim. A re-filed version of the motion to dismiss also claimed that the Complaint improperly joined parties who were not part of the administration of the Trust or Estate—namely, Downs, Dennis Zook, and Catherine Zook. This motion was granted for all parties except Pesce.

Trial took place on December 5, 2011. The court interpreted the Complaint as alleging that the 2008 Living Trust must be set aside as invalid because the Decedent was not of sound mind to enter the new agreement.[3] After some discussion moderated by the court,

---

[2](...continued)
        a check[.]

        17) From my own research there seems to be documents out
        there with the following names for my father: Eugene D. Zook,
        Eugene Dale Zook, Eugene E. Zook, Eugene Zook and Gene
        Zook with Delaware and Maryland addresses and possibly other
        places. Also, I have noticed that my Mother Virginia M. Zook
        has an address for Washington, D.C. I believe.

        18) Etc. these are only some of the complaints and are not
        limited to them. I will provide all written certified/return receipt
        correspondence regarding this matter when needed due to the
        large amount.

[3]Although the Complaint did not specifically articulate a cause of action or a triable issue, the trial court construed the Complaint as alleging that the Decedent was not of sound mind:

        The Court: [T]he problem is that Ms. Zook is self-represented,
        and these complaints are liberally construed when they're
        prepared. And that's the problem for the Court. She alleges it
        [in] paragraph 5. It's something that stuck out like a red flag to

                                                              (continued...)

4

Respondent agreed to provide an audit of the accounting of the trust assets. Notwithstanding this agreement, Petitioner requested access to a copy of the 2007 Living Trust. Downs, responding to Petitioner's subpoena for records, asserted that the 2007 Living Trust was a privileged communication with his deceased client, and that he would assert that privilege on the Decedent's behalf, as well as on the behalf of the trustee of the Living Trust, Pesce. The court honored that privilege and refused to allow Petitioner access to the 2007 Living Trust or allow any questions about its contents.

The court then moved on to the question of the soundness of the Decedent's mind at the time that the 2007 Living Trust was amended. After hearing from four witnesses called by Petitioner, the court found the revisions to the 2007 Living Trust "fair, proper and reasonable under the circumstances." The court then ruled that "Ms. Zook does not have a claim for relief based on paragraph 5 of her complaint." The court ordered the agreed-to audit of trust assets and dismissed the remainder of the complaint against Pesce.

Petitioner appealed to the Court of Special Appeals, again appearing *pro se*. In an unreported opinion, the intermediate appellate court affirmed the Circuit Court. Petitioner, having acquired counsel, petitioned this Court for *certiorari*, which we granted to consider

---

[3](...continued)
> me, because as far as I'm concerned, the rest of it, it really goes
> to the accounting. That's the issue. And the Court says we['ve]
> got to liberally construe these complaints.

the following questions:[4]

> 1. Does the testamentary exception to the attorney-client privilege exist in Maryland?

> 2. Did the trial court err by recognizing the applicability of the attorney-client privilege to the unamended Living Trust?

Although the litigants present the first question as an unresolved issue, this Court has already recognized the existence of the testamentary exception, and we will not depart from our previous holding. *See Benzinger v. Hemler*, 134 Md. 581, 107 A. 355 (1919). With this Court's previous ruling in mind, we hold that the testamentary exception does not grant Petitioner the relief she seeks. Thus, we answer the second question in the negative.

## DISCUSSION

### *The Testamentary Exception To The Attorney-Client Privilege*

---

[4]The question presented in the original petition was worded as:

> Whether the testamentary exception to the attorney client privilege exists in Maryland; if so, does it apply in the circumstances when due to the assertion of "Attorney-client privilege," the trial court precluded significant questioning or production of the previous "living revocable trust" document drafted by the attorney over a year prior to the decedent's death, when the original trust document outlining the distribution of assets and as part of the entire estate planning, was incorporated into the will, but there exists significant concerns that the new trust document was an accurate reflection of the testator's intent, when it was signed while the decedent was heavily medicated, on his death bed in the hospital, with stage 4 prostate cancer, and died three weeks later?

The attorney-client privilege[5] is "a rule of evidence that prevents the disclosure of a confidential communication made by a client to his attorney for the purpose of obtaining legal advice." *E.I. du Pont de Nemours & Co. v. Forma-Pack, Inc.*, 351 Md. 396, 414, 718 A.2d 1129, 1138 (1998). "The privilege is based upon the public policy that 'an individual in a free society should be encouraged to consult with his attorney whose function is to counsel and advise him and he should be free from apprehension of compelled disclosures by his legal advisor.'" *State v. Pratt*, 284 Md. 516, 520, 398 A.2d 421, 423 (1979) (quoting *Harrison v. State*, 276 Md. 122, 135, 345 A.2d 830, 838 (1975)). It has been recognized as "the oldest of the privileges for confidential communications known to the common law." *Upjohn Co. v. United States*, 449 U.S. 383, 389, 101 S. Ct. 677, 682 (1981). Indeed, for over 150 years, this Court has recognized that "[n]o rule is better established than 'that communications which a client makes to his legal adviser for the purpose of professional advice or aid shall not be disclosed, unless by the consent of the client for whose protection the rule was established.'" *Fulton v. Maccracken*, 18 Md. 528, 542–43 (1862). This privilege is reflected in the Maryland Code, as well. *See* Md. Code (1973, 2013 Repl. Vol.), § 9-108 of the Courts and Judicial Proceedings Article ("CJP").

The privilege survives even after the client's death. Invoking the purpose of fostering free communication between attorney and client, the Supreme Court has explained:

[5]For an excellent discussion of the history of the attorney-client privilege, including its roots in 16th-century England, see *Newman v. State*, 384 Md. 285, 300–03, 863 A.2d 321, 330–31 (2004).

> Knowing that communications will remain confidential even after death encourages the client to communicate fully and frankly with counsel. While the fear of disclosure, and the consequent withholding of information from counsel, may be reduced if disclosure is limited to posthumous disclosure in a criminal context, it seems unreasonable to assume that it vanishes altogether. Clients may be concerned about reputation, civil liability, or possible harm to friends or family. Posthumous disclosure of such communications may be as feared as disclosure during the client's lifetime.

*Swidler & Berlin v. United States*, 524 U.S. 399, 407, 118 S. Ct. 2081, 2086 (1998). Thus, even though the client may be deceased, the communication remains privileged.

Nevertheless, the privilege is not absolute. Only those communications "'pertaining to legal assistance'" and "'made with the intention of confidentiality'" are covered by the privilege. *E.I. du Pont*, 351 Md. at 416, 718 A.2d at 1138 (quoting *Burlington Industries v. Exxon Corp.*, 65 F.R.D. 26, 37 (D. Md. 1974)). Additionally, this Court has explained that the privilege does not "'extend to communications made for the purpose of getting advice for the commission of a fraud' or a crime.'" *Newman v. State*, 384 Md. 285, 309, 863 A.2d 321, 335 (2004) (quoting *United States v. Zolin*, 491 U.S. 554, 563, 109 S. Ct. 2619, 2626 (1989)).

Petitioner advocates that we recognize a testamentary exception to the attorney-client privilege, and Respondent concurs. Under this exception:

> [C]onfidential communications between attorney and client for the purpose of preparing the client's will . . . are privileged during the testator's lifetime and, also, after the testator's death *unless sought to be disclosed in litigation between the testator's heirs*, legatees, devisees, or other parties, all of whom claim

8

under the deceased client.

*United States v. Osborn*, 561 F.2d 1334, 1340 (9th Cir. 1977) (emphasis added). The rationale underlying this exception is that in the context of a contested estate, such disclosure "helps the court carry out the decedent's estate plan." Edward J. Imwinkelried, *The New Wigmore, A Treatise on Evidence: Evidentiary Privileges* §6.13.2(b) (Richard D. Friedman ed., 2d ed. 2010). Were a court to exclude such evidence, "the court administering the will might reach an erroneous conclusion about the decedent's donative intent." *Id.* Thus, some states have elected to allow this exception to the attorney-client privilege based on the idea that "'the deceased client would presumably want his communications disclosed in litigation between such claimants so that his desires in regard to the disposition of his estate might be correctly ascertained and carried out.'" *Id.* (quoting California Law Revision Comm'n Comment, Cal. Evid. Code §957, Imwinkelried and Hallahan California Evidence Code Annotated 160 (2001)).

Happily for both parties in this case, Maryland recognized the wisdom of the testamentary exception about a century ago. As this Court explained in *Benzinger*:

> The rule, we think, is well stated in the note *In re Young*[*'s Estate*], 17 L. R. A. (N. S.) 108, in which it is said: "It may be laid down as a general rule of law, gathered from all the authorities, that, unless provided otherwise by statute, communications by a client to the attorney who drafted his will, in respect to that document, and all transactions occurring between them leading up to its execution, are not, after the client's death, within the protection of the rule as to privileged communications, in a suit between the testator's devisees and heirs at law, or other parties who all claim under him."

9

134 Md. at 586, 107 A. at 357 (quoting Burdett A. Rich and Henry P. Farnham, editors, Annotation, *Privilege of communications to attorney during preparation of will*, 17 L.R.A.N.S. 108 (1909)). The *Benzinger* Court held that the trial court erred by not permitting the attorney who drafted the will "to testify as to the transactions, circumstances, and instructions given by the testatrix to him in connection with the will and its preparation, as well as what was said by her at such time relative thereto." 134 Md. at 588, 107 A. at 357–58. The Maryland rule is consistent with that adopted in a majority of states. *See* E. S. Stephens, Annotation, *Privilege as to communications to attorney in connection with drawing of will*, 66 A.L.R.2d 1302 (1959).

As evidenced by this Court's holding in *Benzinger*, the testamentary exception has existed in Maryland for close to a century, despite never having been formally named. Nonetheless, it has been some time since this Court has spoken on the testamentary exception. For this reason, we reaffirm that in a dispute between putative heirs or devisees under a will or trust, the attorney-client privilege does not bar admission of testimony and evidence regarding communication between the decedent and any attorneys involved in the creation of the instrument, provided that evidence or testimony tends to help clarify the donative intent of the decedent.

### *The Applicability Of The Testamentary Exception In This Case*

Our next step is to consider how the testamentary exception applies in this case. Petitioner argues that the trial court erred in refusing to allow her to examine the 2007 Living

10

Trust. Petitioner claims that she was prejudiced because her complaint alleged both that the Decedent was of unsound mind and subject to undue influence, and the content of the 2007 Living Trust was necessary to support this allegation. She relies on this Court's holding in *Moore v. Smith*, 321 Md. 347, 353–54, 582 A.2d 1237, 1239 (1990) in which this Court held that a change from a former will or trust can be a factor in finding undue influence. In Petitioner's view, because the 2007 Living Trust document could demonstrate that the Living Trust had been changed, we should remand the case for a new trial in which she may introduce the 2007 Living Trust, and examine Downs and Pesce about that Trust.

### *Competency Of Decedent*

To evaluate this argument, we look first to the detail of the trial court's substantive rulings on the issue of whether decedent demonstrated unsound mind or undue influence. The court questioned Decedent's lawyer on this point:

> THE COURT: Well, I have a couple of things I want to ask. On the day that this amendment was made to the trust that was - - did Mr. Zook voluntarily make these changes or amendments?
>
> [Downs]: Yes, Your Honor.
>
> THE COURT: And did he sign them without any undue influence?
>
> [Downs]: Yes, he did.
>
> THE COURT: And as far as you know, because you said you have prepared a trust for him previously, were you present when his - - when he signed the December 2nd document?
>
> [Downs]: I believe I'm the notary, Your Honor, yes.

11

THE COURT: And do you recognize his signature? You notarized the document?

[Downs]: Yes.

THE COURT: It is, in fact, his signature?

[Downs]: It is.

THE COURT: Okay. Now, you said that Mr. Zook was not feeling well, but he was coherent, correct?

[Downs]: Yes, he was.

THE COURT: Did the fact that he didn't feel well in any way affect his ability to know and understand what was going on when he was in your office at the time?

[Downs]: No. I had no doubt that he understood what he was doing.

THE COURT: And I might have asked you this already - - did I ask you - - I think I asked you did anyone influence him in any way to get him to sign it? If not, I'm asking you that now.

[Downs]: No, Your Honor. I met with him individually on that day. His daughter brought him there, but I excluded her from the meeting concerning what he wanted to do.

The Judge later explicitly ruled that Petitioner did not have a claim for relief under paragraph 5, which alleges incompetency.

The law governing a challenge to a will or trust based on the decedent's lack of capacity or competency has long been settled:

> "Whether a testator had sufficient mental capacity is determined by a consideration of his external acts and appearances. It must appear that at the time of making the will he had a full

12

> understanding of the nature of the business in which he was engaged; a recollection of the property of which he intended to dispose and the persons to whom he meant to give it, and the relative claims of the different persons who were or should have been the objects of his bounty."

*Sellers v. Qualls*, 206 Md. 58, 66, 110 A.2d 73, 77 (1954) (quoting Philip L. Sykes, *Contest of Wills in Maryland* § 61 (1941)).

The burden is imposed on the person challenging the instrument to prove a *lack* of capacity:

> The law presumes that every man is sane and has capacity to make a valid will, and the burden of proving the contrary rests upon those who allege that he lacked mental capacity. Moreover, in the absence of proof of prior permanent insanity, it must be shown that the testator was of unsound mind at the time the will was executed in order to overcome the presumption of sanity.

*Arbogast v. MacMillan*, 221 Md. 516, 523, 158 A.2d 97, 101 (1960) (citations omitted).

It is clear from the record that Petitioner was allowed to question witnesses regarding the Decedent's mental state and condition on the date the Living Trust was amended in 2008. Petitioner first asked Respondent:

> [Petitioner:] Was he well or was he sick?
>
> [Respondent:] He was of sound mind. He was doing things. He might not have been feeling well, but he was living, enjoying.

Petitioner posed the same question to Respondent's husband, who shared a home with the Decedent:

13

[Joseph Pesce:] He was extremely alert and aware of everything he did and he was still cantankerous and bossy and opinionated, like he always was.

Finally, Petitioner questioned Downs:

[Petitioner:] What was the health of Eugene D. Zook when he came to your office on December 2nd, [20]08?

[Downs:] He was seriously ill with cancer.

[Petitioner:] Seriously ill with cancer? How was his - - how was he acting?

[Downs:] He was coherent and - - just a second. He said he was not feeling well.

Petitioner did not testify herself, and the questions above constituted all of her evidence regarding her father's competency.

Evidence that the Decedent was seriously ill with cancer is not sufficient, by itself, to show a lack of competency. That is all that Petitioner was able to produce in this case. Indeed, her questions produced testimony that Decedent was coherent at the date and time that he signed the 2008 Living Trust. We have no hesitancy in affirming, as did the Court of Special Appeals, the trial court ruling that Petitioner produced insufficient evidence to establish a lack of competence on the part of Decedent.

### *Undue Influence*

Relying on the evidence described above, and the Decedent's act of revising the 2007 Living Trust via execution of the 2008 Living Trust, Petitioner also claims that her father took the actions under the undue influence of her sister and sister's spouse.

14

At trial, Petitioner was able to present witness testimony that established that the 2007 Living Trust had indeed been changed.[6] Petitioner alleged that the 2008 Living Trust was not a faithful representation of the Decedent's true testamentary intent. Consistent with the testamentary exception, the trial court allowed questions to ascertain whether the revised Living Trust was indeed an embodiment of the Decedent's testamentary intent. After considering all the evidence presented, the court concluded "that the transaction of - - that

---

[6]Petitioner had the following discussion with Downs:

> MS. ZOOK: Well, I want to know what the answer was because [Downs] said the parts that were changed.
>
> [Downs]: The parts that were changed, he read.
>
> MS. ZOOK: Okay. And it states that it was changed in its entirety. So the relevance of the question is did he read the entire document?
>
> [Respondent's Counsel]: Objection. I mean, actually, that's argument. It's not really a question.
>
> THE COURT: Well, go ahead and answer the question.
>
> [Downs]: There were only a few paragraphs that changed from the version signed November 20[, 2007] to the document that was signed on December the 2nd, three or four paragraphs. The rest of the document was identical other than the dates.
>
> [Ms. Zook]: So my question - -
>
> [Downs]: And so did I sit there and say read 80 pages when you only have 3 new paragraphs or 4? No. He read the paragraphs that modified the prior existing document.

15

Mr. Eugene Zook made with respect to that December 2nd, 2008 document was fair, proper and reasonable under the circumstances." From this the court concluded that "Ms. Zook does not have a claim for relief based on paragraph 5 of her complaint."

Relying on our holding in *Moore* that a change in a will or trust can be a factor in a finding of undue influence, Petitioner asks for a new trial, implying that the 2007 Living Trust, together with the circumstances already described, would demonstrate grounds to throw out the 2008 Living Trust. We conclude that Petitioner overestimates the efficacy of the evidence she seeks.

In *Moore*, the Court held that "[g]enerally, undue influence amounts to physical or moral coercion that forces a testator to follow another's judgment instead of his own." 321 Md. at 353, 582 A.2d at 1239 (citation omitted). The Court then recognized the following list of elements characteristic of undue influence:

> 1. The benefactor and beneficiary are involved in a relationship of confidence and trust;
>
> 2. The will contains substantial benefit to the beneficiary;
>
> 3. The beneficiary caused or assisted in effecting execution of will;
>
> 4. There was an opportunity to exert influence;
>
> 5. The will contains an unnatural disposition;
>
> 6. The bequests constitute a change from a former will; and
>
> 7. The testator was highly susceptible to the undue influence.

16

*Moore*, 321 Md. at 353–54, 582 A.2d 1239–40 (citations omitted).

As in her charge of incompetency, Petitioner bore the burden to establish that the Decedent was subject to undue influence, and the burden is a heavy one:

> The burden of proof of undue influence was upon the caveators. . . . "[T]he undue influence which will avoid a will must be an unlawful influence, on account of the manner and motive of its exertion, and must be exerted **to such a degree as to amount to force or coercion, destroying free agency**; * * * and there must be satisfactory proof that the will was obtained by this coercion, or by importunities which could not be resisted, so that the motive was tantamount to force or fear." . . . "It is not enough to show a mere suspicion that the will was procured by undue influence exercised and practiced upon the testator * * * or even that a person had the 'power unduly to overbear the will of the testator' * * * but it must appear that the power was actually exercised, and that by means of its exercise the supposed will was produced."

*Koppal v. Soules*, 189 Md. 346, 351, 56 A.2d 48, 50 (1947) (citations omitted) (emphasis added).

"'[A] change of intention [is not] *per se* an indication of undue influence, when there is nothing to show that the change of mind was due to improper constraint.'" *Koppal*, 189 Md. at 350–51, 56 A.2d at 50 (quoting *Malone v. Malone*, 148 Md. 200, 206, 129 A. 10, 12 (1925)). "[N]either old age nor debility is necessarily a yardstick of mental capacity." *Sellers*, 206 Md. at 68, 110 A.2d at 78 (citation omitted). Additionally, "'[e]vidence that the person has a disease which may or must eventuate in mental disease cannot prove, or standing alone tend to prove, that at a given point of time that he is actually so afflicted. The tendency to mental infirmity, cannot *per se* prove the infirmity, it must be shown by facts.'"

17

*Sellers*, 206 Md. at 67–68, 110 A.2d at 78 (quoting *Horner v. Buckingham*, 103 Md. 556, 563, 64 A. 41, 43 (1906)).

The trial court kept these rules well in mind when it ruled. The trial court explained its understanding of the applicable law:

> When it's a confidential relationship, which is what you have here because Ms. Pesce is related, the daughter of Mr. Zook, the caretaker of Mr. Zook before he died[,] . . . the burden shifts to [the defendant's] side to show that the . . . change in the trust . . . was deliberate and voluntary . . . and that the transaction was fair, proper and reasonable.
>
> *      *      *
>
> [H]e must understand the nature of his act and its effect and the person to whom he means to give his property, the manner in which he disposes of it, and the relative claims of the persons who are or should be the objects of his bounty. The crucial time concerning capacity is the time of the execution of the deed.

The trial court's summary of the applicable law was right, except that the burden to prove incapacity or undue influence was on Petitioner, not Respondent. The doctrine of confidential relations will not shift the burden of proof from the caveator to the caveatee in a devise or bequest from a parent to a child. *Koppal*, 189 Md. at 351, 56 A.2d at 50. Thus, in making its ruling, the trial court applied a burden of proof that was overly generous to Petitioner.

The trial court proceeded to make factual findings and apply this law, in a thorough explication. It addressed both competency and undue influence:

> What was Mr. Eugene Zook's capacity at the time that these

18

changes were made in this trust, that is, at the time of December 2nd, 2008. And I know Ms. Zook really wanted to proceed along the lines that he was on medication, he was heavily medicated, that he's dying of cancer, that he, in other words, couldn't have been of the mind to execute this amendment. That's really what's [sic] she's getting at.

\* \* \*

But what I heard that really is relevant to resolving the issue is that Ms. Pesce drove Mr. Eugene Zook to Mr. Downs' office on December 2nd; that Mr. Downs as his counsel advised him, Mr. Eugene Zook, rather, met with him separately, advised him outside the presence of Ms. Pesce; that even though Mr. Eugene Zook was not feeling well, as Mr. Downs testified, he was coherent, and the fact that he didn't feel well did not affect his ability to understand everything; that he understood everything; and that he voluntarily entered this amendment; and that he was not influenced in any way in doing so; and that it is, in fact, his signature, and that he was familiar with his signature because he had prepared the trust previously, which was the one in - - . . . in '07. Plus, he said he had met with him three times, August [sic] 23rd, '07, November 20th '07, December 2nd, 2008, so two previous occasions before, so he was obviously familiar with Mr. Eugene Zook and felt that he was of the mind to execute this December 2nd, 2008 document. And he did do so.

He also said that there was [sic] only a few changes, three or four paragraphs that were changed. And even though he didn't read everything, didn't sit there and watch him read everything, he read the portions that the amendments were made. And obviously, counsel was satisfied, Mr. Downs, that is, and he said he even notarized the document.

So with that in mind, the Court certainly believes Mr. Downs. He is the officer of the Court. I don't think he would come here and not be truthful. I believe he is truthful, and I accept his testimony. And I find that the transaction of - - that Mr. Eugene Zook made with respect to that December 2nd, 2008 document was fair, proper and reasonable under the circumstances. And

19

> I find that that being the case and having been shown in Ms. Zook's case, that the burden upon Defendant has been satisfied and that Ms. Zook does not have a claim for relief based on paragraph 5 of her complaint.

The court did not consider the terms of the 2007 Living Trust or allow Downs to be questioned about it. Given our longstanding, if not oft-repeated, recognition of the testamentary exception to the attorney-client privilege, it appears that the trial court should have allowed Petitioner to discover and introduce the 2007 Living Trust. This was error.

In resolving this appeal, however, we keep in mind that, in a civil case, a petitioner must not only show error but must demonstrate that the error was prejudicial. *Barksdale v. Wilkowsky*, 419 Md. 649, 657, 20 A.3d 765, 769–70 (2011) ("'It has long been the policy in this State that this Court will not reverse a lower court judgment if the error is harmless.'" (quoting *Flores v. Bell*, 398 Md. 27, 33, 919 A.2d 716, 719 (2007))). As we saw above, a modification to a will or trust is one of several factors that may be considered in a caveat proceeding.

The fundamental problem with Petitioner's argument is that she has produced no evidence, other than this change in the terms of his Living Trust, to support a claim that Decedent was subject to undue influence. And we would be unwise indeed to hold that a mere change in a will or trust, even by someone of advanced age and in ill health, is sufficient to create a prima facie case for establishing undue influence or unsound mind. Such a rule would not only induce more litigation, but could discourage people from making desired and appropriate revisions to their wills or trusts. As we explain below, applying

20

traditional *Moore* standards for undue influence, we do not see how Petitioner could establish undue influence, even if she could have introduced the 2007 Living Trust and questioned Downs and Pesce about it.

### *Moore Factors*

The *Moore* factors stated above may vary in significance, depending on the case, but here, the most significant is the fifth factor, which we discuss first—that "[t]he will contains an unnatural disposition." Here, Petitioner received a share of her father's assets equal to her siblings, including Respondent, who provided a home for the Decedent, and drove him to the attorney's office. The only difference between Petitioner's share and her siblings' shares was that her share was held in trust and distributed to her in twenty payments over a period of ten years. If she died within that period, her descendants received the remaining principal, including accrued income. Although Ms. Zook evidently would prefer to receive her share outright, it cannot be said that placing one child's equal share in trust is an "unnatural disposition"—such a devise is generally used for the protection of the beneficiary. Even if the trial court had seen the 2007 Living Trust, and that Trust had given Ms. Zook her share outright, there is no reason to think that the trial court would have or should have been swayed into thinking that the Decedent's 2008 Living Trust contained "an unnatural disposition." Certainly, it is natural for a father to decide, at some point, that one of his children will not preserve and protect her own bequest, and for that reason, exercise his judgment to maintain that share in trust for the child's benefit.

21

By the same token, there is no showing that the second *Moore* factor, that "[t]he will contains substantial benefit to the beneficiary," is established in this case. The Respondent receives the same share of the residuary estate as Petitioner and the other children. Respondent received no additional benefit from the Decedent's decision to maintain Ms. Zook's share in trust.[7] We do not see how the trial court's consideration of the terms of disposition of the 2007 Living Trust, whatever it said, would have, or should have, influenced its decision on the first or second factor.

As to the third factor, that "[t]he beneficiary caused or assisted in effecting execution of the will," the only evidence was that Respondent drove Decedent to his lawyer's office. Mr. Downs testified that she was excluded from the room when the will was discussed and executed. Downs also said that he "had no doubt that [Decedent] understood what he was doing." Knowing the contents of the 2007 Living Trust or the circumstances of its execution would not have influenced the trial court in applying this factor.

---

[7]Petitioner did not argue that any monetary compensation Respondent would receive as a trustee was a "substantial benefit" to Respondent within the meaning of *Moore v. Smith*, 321 Md. 347, 582 A.2d 1237 (1990), and in the absence of any showing that her fees, if any, were sufficiently substantial to be considered as a factor, we will not consider that. Nor does Petitioner argue that the Decedent's bequest to Respondent of all tangible personal property was a "substantial benefit." This is a natural bequest when the Decedent lived with Respondent during his last years. If Petitioner had alleged that the Decedent had particularly valuable tangible personal property, then this might be a subject worth considering in applying the fifth factor from *Moore*. But no such allegation was made, nor evidence produced, and in its absence, the trial court had no reason to consider the bequest of his tangible personal property to Pesce as a "substantial benefit" to Pesce in deciding whether Petitioner proved undue influence under the *Moore* factors.

22

Nor did Petitioner introduce any evidence to support the seventh *Moore* factor: "the testator was highly susceptible to the undue influence." Illness alone is not sufficient to support this factor. In response to Petitioner's question, Joseph Pesce answered that Decedent "was still cantankerous and bossy and opinionated, like he always was." Petitioner chose not to testify, and offered no evidence that Decedent was "highly susceptible to undue influence." Petitioner's evidence on this point falls short.

To be sure, Respondent and the Decedent may have been in a confidential relationship (factor one) and Respondent may have had an opportunity to exert influence over him (factor four). But, as explained above, under these circumstances, we are confident that even with the presence of these two factors, the trial court would not have ruled differently on the issue of undue influence had it known the exact terms of the trust modification. Petitioner, therefore, is not entitled to a new trial.

## CONCLUSION

In sum, the testamentary exception to the attorney-client privilege is alive and well in Maryland. With its refusal to recognize that exception, the trial court erred by failing to require that Downs produce the 2007 Living Trust. Yet, Petitioner has the burden to demonstrate that the trial court's error was prejudicial. *Barksdale*, 419 Md. at 657, 20 A.3d at 769–70. We have carefully considered the test for mental competency, and the seven-factor *Moore* test for undue influence, to determine whether, *had* the trial judge considered the terms of the 2007 Living Trust, it might have changed its ruling on either competency or

undue influence.  After due consideration, we conclude that admission into evidence of the 2007 Living Trust, or evidence relating to its execution, would not have persuaded the trial court to rule any differently.  Accordingly, we hold that Petitioner is not entitled to a new trial.

In her brief, Petitioner requests:

> [T]hat this Court find that the trial court erred in excluding as [a]ttorney-client [p]rivileged, the production and all questioning surrounding various [d]ocuments including the November 20, 2007 Original Trust document, to the Petitioner, as an entitled beneficiary under the testamentary exception, and Remand the case back to the Circuit Court for Prince George's County for a [n]ew [t]rial.

For the above reasons, we decline to grant this relief.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE DIVIDED EQUALLY BETWEEN THE PARTIES.**

24